STATE OF NORTH CAROLINA v. WILLIE LEE WILLIAMS,
A/K/A BUBBA WILLIAMS

No. 6

(Filed 14 April 1977)

1. Criminal Law § 34.7— first degree murder — evidence of earlier murder — admissibility to show motive and intent

In a prosecution for first degree murder of a highway patrolman and larceny of automobiles, the trial court did not err in allowing defendant's companion in the crimes to testify concerning defendant's participation in a prior armed robbery and murder, since such evidence was competent to show motive and intent and to show that the patrolman was killed for the purpose of concealing another crime; moreover, the earlier robbery and murder, the larceny of the automobiles for the purpose of escape, and the murder of the patrolman were so connected in point of time and circumstance that the patrolman's murder could not be fully shown without proving the other offenses.

2. Criminal Law § 86.5—cross-examination of defendant — prior armed robberies — impeaching questions proper

The trial court in a first degree murder and larceny prosecution did not err in allowing the district attorney to question defendant on cross-examination as to whether he had committed certain named armed robberies during the week preceding the murder for which he was on trial, since a defendant in a criminal case who testifies in his own behalf may be questioned about specific acts of misconduct for the purpose of impeachment.

3. Constitutional Law § 80; Homicide § 31— first degree murder — life sentence substituted for death penalty

A sentence of life imprisonment is substituted for the death penalty imposed in this first degree murder case.

DEFENDANT appeals from judgments of *Tillery, J.,* 14 June 1976 Session, NEW HANOVER Superior Court.

Defendant was tried upon four separate bills of indictment, proper in form, charging him with (1) the first degree murder of Hugh Richard Griffin on 14 September 1975, (2) the felonious larceny on the same date of a 1964 model Ford of the value of $500, the property of Joseph Troy Casey, (3) the felonious larceny on the same date of a 1974 two-door Dodge automobile of the value of $2,000, the property of Fairway Ford, Inc., and (4) possession of heroin. The cases were consolidated for trial.

Joseph Sweat testified as a witness for the State. His testimony tends to show that on 10 September 1975 he, the de-

fendant Willie Williams (also known as Bubba Williams) and George "Pokey" Davis were driving around Wilmington looking for a store to rob. Finding K & B's Grocery Store on Castle Street open, they robbed it, taking $60 from the cash register. During the robbery Joseph Sweat shot Thurston Smith twice with a .22 caliber pistol and defendant shot him once with a .38 caliber pistol. After the robbery the defendant and Sweat met Davis in a waiting car and rode to the home of defendant's grandmother. The $60 was used to buy heroin.

On 13 September 1975 Sweat saw defendant at James Carr's house and told him they were both wanted by the police for the death of Thurston Smith. At that time there were three pistols in the house—a .22 caliber, a .38 caliber and a silver and brown .357 Magnum which defendant told Sweat he had taken from a man named "Pop." Sweat and defendant remained at Carr's house until around 4 p.m. on 14 September 1975 when they got a ride to a Cadillac dealership where defendant broke into the trunk of his brother's car and obtained tools used to start cars without the ignition key. Defendant and Sweat then used these tools to start a white 1964 Ford parked nearby. They stole the Ford and drove it to Carr's house. There they picked up the three pistols and placed them in a blue and red bag along with the tools and headed toward Burgaw, Pender County, North Carolina. Near Burgaw, using the tools they had used to start the Ford, they started the motor of a Dodge located on a car lot and stole it, intending to take it New York and sell it. Defendant drove the Dodge while Sweat drove the Ford as they proceeded along dirt roads until they came to a dead end. There defendant jacked up the Ford, punched holes in its gas tank and filled two containers with gasoline which he then poured into the Dodge. The battery and license plate from the Ford and the bag containing the tools and pistols were transferred to the Dodge. At that point defendant and Sweat abandoned the Ford, drove back to the highway in the Dodge and headed toward Jacksonville with defendant driving.

Defendant and Sweat were stopped for speeding by Highway Patrolman Hugh Richard Griffin. Defendant told Trooper Griffin that his name was Ernest Carr and that he had left his driver's license at home. The officer ordered defendant to follow him to Burgaw where he would be placed under a $100 bond for speeding. Trooper Griffin led the way in his car, and defendant and Sweat followed him in the Dodge. Defendant told

---

State v. Williams

---

Sweat he could not go to jail because the authorities in Burgaw would discover he was wanted for the murder of Thurston Smith in Wilmington and therefore he had to kill the patrolman. Defendant began steering the Dodge from side to side and blowing the horn. Both cars stopped, and defendant told Trooper Griffin something was wrong with the car and he couldn't drive it. The officer told him to drive only 35 miles per hour. The two cars started off again, this time with the patrol car behind the Dodge. Defendant blew his horn again and stopped. He told Sweat to hand him the .357 Magnum so he could shoot Trooper Griffin between the eyes and dump the body in the woods.

As Trooper Griffin approached the Dodge, defendant told him he would have to call a wrecker to get the car to Burgaw. When the officer appeared angry, defendant again agreed to drive and Trooper Griffin turned to walk back to his car. With the .357 Magnum in hand, defendant called to the patrolman and fired. The officer grabbed his side and defendant fired three more shots, then sped away as Trooper Griffin fired at them and began struggling back to his patrol car.

Defendant drove the Dodge into a blueberry field, back onto the highway, and then into another field where he finally hit a tree. Defendant told Sweat to get the tools and guns and wipe all fingerprints off the car. Defendant emptied three shells from the gun used to shoot Trooper Griffin, and Sweat placed that gun and the .22 caliber pistol back in the red and blue bag which he later lost while they were in a wooded area attempting to elude a police search. A few hours later defendant and Sweat were found in the woods and arrested. On 15 September 1975 Sweat led officers to the area where the guns had been lost and told them where the white 1964 Ford could be found.

Sweat pled guilty to accessory before and after the fact of murder in connection with Trooper Griffin's death and pled guilty to possession of heroin and to larceny of the Ford and the Dodge, receiving a life sentence and a twenty-five year sentence.

At the time of this trial Sweat had not been tried for the robbery and shooting at K & B's Grocery, but defendant had been tried, convicted and sentenced to death for the murder of

Thurston Smith during that robbery. See 290 N.C. 770, 228 S.E. 2d 241 (1976), where his conviction was upheld.

The State's evidence further tends to show that defendant had stolen a .38 caliber pistol from Willie Lee "Pop" Gibbs. This weapon, a Colt .38 caliber Special, Diamond Back Model, closely resembles a .357 Magnum Colt pistol, and was the gun actually · used by defendant to kill Trooper Griffin. Joseph Sweat was misinformed about the caliber of the gun and referred to it in his testimony as a .357 Magnum.

Joseph Casey testified that on 14 September 1975 he parked his 1964 white Ford on Market Street in Wilmington and returned around 5 p.m. to find it gone. He next saw it in Burgaw on the following day and observed that the trunk had been forced open and that the battery, license plate and other items were missing.

Hugh Highsmith, owner of Fairway Ford, Inc., in Burgaw, testified that the Dodge car, license HNF-385, was missing from his lot on 14 September 1975.

Defendant testified as a witness in his own behalf. He stated that on 14 September 1975 he and Joseph Sweat stole the two automobiles mentioned in Sweat's testimony. When stopped by Trooper Griffin, they had left the white Ford in the woods and had returned to the highway in the Dodge with defendant driving. Trooper Griffin turned on his blue light, stopped the Dodge, walked to the door of the car and said defendant was driving too fast. While seated in the patrol car Trooper Griffin "called in" the license number of the car and told defendant that the license plate did not go on the Dodge. Defendant replied that he had only obtained the Dodge on Friday and the plate hadn't been "changed over." The officer stated that the car was not stolen and neither was the plate but said defendant would have to go to Burgaw where they would probably set a bond and permit defendant to continue on his way. They left for Burgaw with defendant driving the Dodge behind the patrol car.

Defendant testified that he was afraid the officials in Burgaw would see that the ignition switch had been ripped out of the Dodge and for that reason wanted to leave the Dodge beside the highway and ride to Burgaw with the patrolman. Then after his sister or other relative had made his bond, he planned

State v. Williams

to return to the Dodge and continue on his way. For that reason he pretended the Dodge did not steer properly and twice induced the patrolman to stop. The third time they stopped he had run over a Budweiser box with some cans in it and told the patrolman when he approached the car that something was. hung up under the bottom. Then defendant said: "I saw him turn real quick and then I heard a couple of shots which seem to come from the right side of the car. The shots hit the patrolman as he was turning around to go back to the car. I jumped into my car and mashed the gas. Sweat was jumping in on the other side. I would have left him if he had not. I did not have a gun and I did not fire the shots. The car was weaving and the patrolman was firing at us."

On cross-examination defendant admitted, over objection, that, using a pistol, he robbed one Tetterton of $142 on 8 September 1975; that, using a pistol, he robbed Ernest Pinyan of $75 on 9 September 1975; that, using a .38 caliber pistol, he robbed A. E. Lewis on 10 September 1975; that, using a pistol, he robbed one Keels of $120 on 11 September 1975. He further admitted that on 12 or 13 September 1975, using a pistol, he robbed Willie Gibbs of money and a .38 caliber Diamond Back Special. He stated that he had two .38 caliber pistols at James Carr's house and last saw them when Joseph Sweat put them in a sack at Carr's house with a .22 caliber pistol belonging to Sweat. He said the .22 caliber pistol was taken in the robbery at Pinyan's Grocery.

At the close of all the evidence defendant's motion for nonsuit on the charge of possession of heroin was allowed. His motion for nonsuit with respect to the two counts of larceny and the charge of murder was denied. The jury convicted him in those three cases and he was sentenced to death for the murder and given consecutive ten-year terms for the auto thefts, the first to commence at the end of the sentence pronounced in the murder case.

Having admitted the theft of the automobiles, defendant did not appeal the sentences in those cases. His appeal in the murder case presents for consideration the assignments of error discussed in the opinion.

*Rufus L. Edmisten, Attorney General; Charles M. Hensey, Assistant Attorney General; Jane Rankin Thompson, Associate Attorney, for the State of North Carolina.*

*John Richard Newton and William B. Harris III, Attorneys for defendant appellant.*

HUSKINS, Justice.

[1] Defendant contends the testimony of Joseph Sweat regarding defendant's participation in the armed robbery at K & B's Grocery Store on Castle Street and the murder of Thurston Smith should have been excluded since it put defendant's character in issue and its only relevancy was to show that defendant had committed another distinct, independent, separate crime. Admission of this evidence over objection constitutes defendant's first assignment of error.

It is a general rule of evidence that in a prosecution for a particular crime the State cannot offer evidence tending to show that the accused has committed another distinct, independent, separate offense. Exceptions to the general rule of inadmissibility, as well recognized as the rule itself, are discussed and documented by Mr. Justice Ervin in *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). The second and fifth exceptions there stated are pertinent here and read as follows:

> "2. Where a specific mental intent or state is an essential element of the crime charged, evidence may be offered of such acts or declarations of the accused as tend to establish the requisite mental intent or state, even though the evidence discloses the commission of another offense by the accused." (Citations omitted.)

> "5. Where evidence tends to prove a motive on the part of the accused to commit the crime charged, it is admissible, even though it discloses the commission of another offense by the accused." (Citations omitted)

*Stansbury* formulates the rule thusly:

> "Evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; but if it tends to prove any other relevant fact it will not be excluded merely because

it also shows him to have been guilty of an independent crime." 1 Stansbury's North Carolina Evidence (Brandis rev. 1973) § 91.

Joseph Sweat testified, in effect, that defendant said he could not accompany Trooper Griffin to Burgaw to make bond for speeding because the authorities there would discover he was wanted for the murder of Thurston Smith in Wilmington during the K & B Grocery robbery on 10 September 1975, and for that reason he had to kill Trooper Griffin.

The challenged evidence was competent under the exception noted in *State v. McClain, supra,* to show both motive and intent. Moreover, Sweat's testimony was competent to show that Trooper Griffin was killed for the purpose of concealing another crime. *State v. Beam,* 184 N.C. 730, 115 S.E. 176 (1922). In fact, the robbery and murder at K & B's Grocery, the theft of the two cars for purpose of escape, and the murder of Trooper Griffin are so connected in point of time and circumstance that the trooper's murder cannot be fully shown without proving the other offenses. These crimes are all an integral link in the chain of events leading to Trooper Griffin's murder by the defendant. The challenged evidence was competent and properly admitted. *State v. Arnold,* 284 N.C. 41, 199 S.E. 2d 423 (1973); *State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667 (1962); *State v. Adams,* 245 N.C. 344, 95 S.E. 2d 902 (1957); *State v. Fowler,* 230 N.C. 470, 53 S.E. 2d 853 (1949). Defendant's first assignment of error is overruled.

[2]  Defendant took the stand as a witness in his own behalf. On cross-examination the district attorney was permitted, over objection, to ask defendant whether he had *committed* certain named armed robberies on each day of the week preceding Trooper Griffin's murder, to which defendant responded that he had committed all except one of the armed robberies mentioned, including the robbery at K & B's Grocery on 10 September 1975. Admission of this evidence constitutes defendant's second assignment of error.

It has long been the rule that when a defendant in a criminal case testifies in his own behalf, specific acts of misconduct may be brought out on cross-examination to impeach his testimony. *State v. Colson,* 194 N.C. 206, 139 S.E. 230 (1927); 1 Stansbury's North Carolina Evidence (Brandis rev. 1973) § 111. Such cross-examination *for purposes of impeachment* is not

limited to conviction of crimes. "Any act of the witness which tends to impeach his character may be inquired about or proven by cross-examination." *State v. Sims*, 213 N.C. 590, 197 S.E. 176 (1938). A defendant may not be asked whether he has been accused, arrested or indicted for a particular crime, but "[i]t is permissible, for purposes of impeachment, to cross-examine a witness, including the defendant in a criminal case, by asking disparaging questions concerning col'ateral matters relating to his criminal and degrading conduct. [Citations omitted.] Such questions relate to matters *within the knowledge of the witness,* not to accusations of any kind made by others." *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971). The scope of such questions is subject to the discretion of the trial judge, and the questions must be asked in good faith. *State v. Williams, supra; State v. Ross*, 275 N.C. 550, 169 S.E. 2d 875 (1969) ; *State v. Bell*, 249 N.C. 379, 106 S.E. 2d 495 (1959). When defendant's second assignment is subjected to these rules, its lack of merit is quite apparent.

[3]    The Court notes *ex mero motu* that in *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (decided 2 July 1976), the United States Supreme Court invalidated the death penalty provisions of G.S. 14-17 (Cum. Supp. 1975), the statute under which defendant was indicted, convicted and sentenced to death. Therefore, by authority of the provisions of the 1973 Session Laws, chapter 1201, section 7 (1974 Session), a sentence of life imprisonment is substituted in lieu of the death penalty in this case. The consecutive ten-year terms for the auto thefts, unappealed from, shall commence at the end of the life sentence.

Our examination of the entire record discloses no error affecting the validity of the verdict returned by the jury. The trial and verdict must therefore be upheld. To the end that a sentence of life imprisonment may be substituted in lieu of the death sentence heretofore imposed, the case is remanded to the Superior Court of New Hanover County with directions (1) that the presiding judge, without requiring the presence of defendant, enter a judgment imposing life imprisonment for the first degree murder of which defendant has been convicted; and (2) that in accordance with this judgment the clerk of superior court issue commitments in substitution for the commitments heretofore issued. It is further ordered that the clerk furnish

to defendant and his counsel a copy of the judgment and commitments as revised in accordance with this opinion.

No error in the verdict.

Death sentence vacated.