STATE OF NORTH CAROLINA v. BOBBY LEE WILLARD

No. 34

(Filed 10 May 1977)

1. **Criminal Law § 29— competency to stand trial — sheriff's "personal feeling" — absence of prejudice**

   In a pretrial hearing to determine defendant's competency to stand trial, defendant was not prejudiced by a sheriff's testimony that it was his "personal feeling" defendant's attitude and manner of speech changed because prisoners from Central Prison who were placed in jail with defendant had talked to him, even if such testimony was incompetent, where it does not appear that the trial judge based his findings on the incompetent evidence.

2. **Criminal Law § 29— test of mental competency to stand trial**

   The test of defendant's mental competency to stand trial is whether he has the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed.

3. **Criminal Law § 29.1— determination of mental competency to stand trial**

   The issue of defendant's mental competency to stand trial may be determined by the trial court with or without the aid of a jury.

4. **Criminal Law § 29.1— competency to stand trial — non-jury hearing — conclusiveness of findings**

   When the trial court conducts an inquiry without a jury to determine defendant's competency to stand trial, the court's findings of fact, if supported by competent evidence, are conclusive on appeal.

5. **Criminal Law § 29— competency to stand trial — conflicting evidence**

   Although a psychiatrist who examined defendant in July and August 1976 was of the opinion that defendant was mentally incompetent to stand trial in August 1976, the trial court's determination that defendant was mentally competent to stand trial was supported by (1) defendant's score of 26 on the Competency Screening test in November 1975, which was well within the range of competency to stand trial according to standards established by the National Institute of Mental Health; (2) another psychiatrist's expert opinion that when he examined defendant in November 1975 defendant was

competent to stand trial; and (3) testimony of the sheriff, who observed defendant in jail from the time of his arrest until trial (except for the periods he was in a State hospital), that defendant was a normal prisoner and carried on normal conversations until recently when he started "rambling in his talk" after he had been placed with some prisoners from Central Prison.

**6. Criminal Law § 29; Constitutional Law § 32— amnesia — competency to stand trial — fair trial**

Amnesia concerning the events of the crime does not *per se* render a defendant incapable of standing trial or of receiving a fair trial.

**7. Criminal Law § 63.1— evidence of legal insanity**

A defendant who pleads insanity in bar to a criminal charge is entitled to introduce evidence relevant to *legal* insanity.

**8. Criminal Law § 63.1— insanity — exclusion of expert's testimony**

The trial court did not err in refusing to permit a psychiatrist to testify as to his findings that defendant suffered from simple schizophrenia and alcohol pathological intoxication at the time of the crime where the witness was permitted to state his opinion that defendant suffered from some type of psychosis at the time of the crime, no proper foundation was laid for the witness's opinion as to simple schizophrenia and alcohol pathological intoxication, and the witness stated that he was unable to form an opinion as to whether defendant knew right from wrong at the time of the crime, which was the relevant consideration.

**9. Criminal Law § 5— insanity — M'Naghten Rule — constitutionality**

The ability to distinguish between right and wrong test [M'Naghten Rule] for legal insanity is constitutional.

DEFENDANT appeals pursuant to G.S. 7A-27(a) from judgments of *Walker, H. H., J.,* entered 26 August 1976, STOKES Superior Court. Defendant's conviction of felonious assault with a deadly weapon with the intent to kill inflicting serious injury was certified for initial appellate review by the Supreme Court pursuant to G.S. 7A-31(a) on 21 December 1976.

On indictments, proper in form, defendant was charged with first degree burglary, aggravated kidnapping, assault with intent to commit rape, and assault with a deadly weapon with intent to kill inflicting serious injury.

Defendant entered a general plea of not guilty and a special plea of not guilty by reason of insanity to each indictment. The assault with intent to commit rape charge was dismissed upon motion of the district attorney at the close of the State's evidence. Defendant was found guilty of the remaining offenses. The court imposed the mandatory life sentence for the first

State v. Willard

degree burglary conviction, life imprisonment for the aggravated kidnapping conviction to commence at the expiration of the burglary sentence, and a sentence of ten years imprisonment for the assault with a deadly weapon with intent to kill inflicting serious injury conviction to commence at the expiration of the kidnapping sentence.

The evidence for the State tended to show the following:

On the evening of 4 November 1975, Alma M. Joyce, aged 74, was living by herself at her home in Prestonville, North Carolina. She went to bed about 10:30 p.m. and before retiring, closed and locked all the outside doors and windows. She was awakened about 11:00 p.m. when she heard a "scrambling" under her bed. The defendant jumped out from under the the bed. Mrs. Joyce ran through the house and out the front door, which she found half open, towards her daughter's house. The defendant gave chase and caught her at the mail box. Putting his hands over her mouth, he forced her back into the house. In the kitchen he said, "I am bloodthirsty and I came to kill you" and proceeded to cut Mrs. Joyce with a pocket knife across her face and throat.

The defendant then pushed her into the bedroom where he kept her confined for five or six hours. During the night, he cut the telephone cord, the refrigerator and some calendars in the kitchen. Periodically, he resumed his assaults, cutting the victim numerous times on the hands, arms, breast, back and other parts of the body. He slit Mrs. Joyce's dresses that were hanging in the bedroom and cut off her night clothes. At 6:30 a.m. he finally left. Shortly thereafter, Mrs. Joyce heard a gunshot. Defendant had previously told the victim that he had left a gun outside beside a tree.

After defendant had gone, Mrs. Joyce staggered out of the house onto the steps and slumped down. Neighbors responded to her screaming and she was taken to the hospital where she remained for two weeks. She was on the operating table for five hours and received 400 stitches to close her wounds.

Mrs. Joyce had known the defendant before the attack. The defendant, on occasion, had stayed with his brother who farmed Mrs. Joyce's land and had assisted his brother in packing tobacco and carrying it to market. Mrs. Joyce and the defendant had never exchanged any cross words prior to the assault.

Mrs. Joyce described the defendant as calm during the entire evening. He smoked cigarettes all through the morning from a Winston package. When she inquired if he was drunk, he told her that he was not but that he had smoked some "LSD cigarettes."

According to the SBI Laboratory report, a button found at Mrs. Joyce's house was similar to one missing off a shirt belonging to the defendant. A knife recovered from the defendant revealed bloodstains of the same type as Mrs. Joyce's blood (defendant's own blood type was different). A flashlight and some shotgun shells were discovered near Mrs. Joyce's house. The screen door on the front of her house had been damaged.

Prior to trial, defendant was twice committed to the State mental hospital, Dorothea Dix, for a period of observation and treatment pursuant to G.S. 15A-1002. He was hospitalized November 10-21, 1975, and July 23-August 20, 1976. After each period of hospitalization, he was returned to the Stokes County Jail.

Prior to jury selection, counsel for the defendant moved presumably for a continuance because "the defendant was unable to plead his case and understand the nature of the charges and is unable to stand trial because of mental incompetency."

At the hearing on the motion, defendant's evidence tended to show that Dr. Billy Williamson Royal, a staff psychiatrist, had examined the defendant during the months of July and August 1976 while he was at Dorothea Dix Hospital. The examination revealed that the defendant was illiterate and had an IQ of 53, which is regarded as mild to moderate retardation. According to Dr. Royal's diagnosis, the defendant was also suffering from schizophrenia, simple type, which is a "type of illness that comes on insidiously or slowly so there is not an acute sudden onset." At the hospital defendant experienced auditory hallucinations and paranoia according to Dr. Royal. In addition, the defendant was diagnosed as having suffered from alcohol pathological intoxication on the evening of the crime. The defendant had no memory of the offense and thought he had already been tried for it. This mental amnesia, in the opinion of Dr. Royal, was attributable to his alcohol pathological condition and possible drug use on the night of the crime.

State v. Willard

Dr. Royal testified that alcohol pathological intoxication is very unusual. "It is a condition in which a person is not aware of what they were doing. They are operating with what may be called a deranged mental mechanism in terms of what they are doing. Having in essence no control over their operation. In lay terms, crazy or psychotic. In other words, it is a condition that person is in when he commits a perfectly senseless crime which is unexplained. It is an unusual condition brought on by alcohol in some people on some occasions, in a very low percentage of cases. It is a form of drunkenness or the effects of alcohol upon the mind. . . . From a *psychiatric* standpoint a person in this condition is simply not responsible for what he is doing or does not know any better." (Emphasis supplied.) Defendant told Dr. Royal that he consumed a fifth of alcohol, plus some beer, on the day in question. Defendant admitted customarily drinking substantial amounts of alcohol on weekends. The alleged crime was comitted on a weekday.

Dr. Royal was of the opinion that as of 20 August 1976 the defendant was not capable of assisting with his defense. Specifically, Dr. Royal did not think the defendant had the mental capacity to comprehend his position and the nature and object of the proceedings against him, to conduct his defense in a rational manner and to cooperate with his counsel to the end that any available defense may be interposed. Dr. Royal stated the defendant did understand the difference between right and wrong at the time of his examination.

Dr. Royal felt that the defendant's mental condition had deteriorated since the time of his first commitment to Dorothea Dix Hospital and Dr. Royal based his opinion that the defendant was incapable of standing trial on this deterioration in mental state.

The defendant's sister and mother both testified that the defendant's personality had changed for the worse while he was in jail and confirmed his amnesia concerning the events of the crime.

The State's evidence in opposition to the motion tended to show that Dr. James Groce, a staff psychiatrist at Dorothea Dix Hospital, had examined the defendant when he was first sent to the hospital in November 1975. It was the opinion of Dr. Groce that the defendant could understand his position in the court and the nature of the charges against him and could

intelligently cooperate with his attorney in preparing his defense.

Dr. Groce indicated that alcohol pathological intoxication was rare. He testified that the fact that the assault took place over a five to six hour period, and that no alcohol was consumed during this time, made it less likely that the defendant was in a state of pathological intoxication. Dr. Groce felt that over this period of time, with no further consumption of alcohol, a person would sober up or at least his alcohol pathological intoxication would diminish.

Dr. Groce found no simple schizophrenia or other psychosis. Defendant had no problems with delusions or hallucinations during his first stay at the hospital. The doctor was of the opinion that the defendant knew the difference between right and wrong at the time he examined him. His only diagnosis was mild mental retardation. The defendant reported drinking alcohol on the day of the crime but did not report the use of any drugs to the doctor.

During the November 1975 commitment, defendant was administered the Competency Screening Test, designed by the National Institute of Mental Health to assist in determining a person's capacity to proceed to trial. The maximum score on the test is 40, and a score above 20 is evidence of capacity to proceed to trial. The defendant scored 26.

Sheriff Tony Blalock of Stokes County testified that he had observed the defendant in jail during his incarceration and had normal conversations with him from time to time. When defendant first returned from Dorothea Dix in November 1975, he was permitted to do small jobs around the jail and appeared to be a normal prisoner. After the last term of superior court the defendant's attitude changed and his speech became "rambling." (We take judicial notice that the "last term" was the 7 June Session of Stokes Superior Court.) Several prisoners from Central Prison were placed in the county jail for that session of court and these people had talked "a lot" to the defendant. It was the Sheriff's feeling that these conversations had something to do with the change in the defendant.

At the close of the evidence, the court made findings of fact and based on those findings concluded that "the defendant is capable of standing trial at this time and [is able] to plead

to the bills of indictment against him." More specifically, the court concluded that "the defendant at this time does in fact have the mental capacity to comprehend his position and to understand the nature and the object of the proceedings against him and to conduct his defense in a rational manner and to cooperate with his attorney to the end that any available defense may be interposed." Whereupon, defendant's motion was denied and the matter proceeded to trial.

Other facts necessary to the decision will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General James Wallace, Jr. for the State.*

*James L. Dellinger, Jr. for defendant appellant.*

COPELAND, Justice.

[1] Defendant first contends the court erred when it allowed Sheriff Blalock at the pretrial hearing on defendant's motion to express a personal opinion as to why defendant's mental condition had changed.

The record of the hearing discloses the following testimony by Sheriff Blalock on direct examination:

"When Bobby came back from the hospital the first time back in November, the jailer let him out on different occasions to do small jobs around the jail and he appeared to be a normal prisoner. The unusual something came up right before the last term or right after the last term of Superior Court. That is when I noticed a change in Bobby. There was a change in Bobby's attitude. He started sort of rambling in his talk rather than talking about specific things. I might add that at the time that we had Superior Court we had several prisoners here from Central Prison as we have at this time and my own personal feeling is ......"

"MR. DELLINGER: Objection.

"COURT: Overruled.

"A. It is my feeling and my observation that these people talked a lot to Bobby and I feel that is one reason why he changed.

"MR. DELLINGER: Objection.

"COURT: Overruled."

A layman who has had a reasonable opportunity to form an opinion based on observation may testify as to the mental capacity of a defendant in a criminal case. *State v. Hammonds*, 290 N.C. 1, 224 S.E. 2d 595 (1976); 1 Stansbury's N. C. Evidence, § 127 (Brandis Rev. 1973); *see State v. Thompson*, 285 N.C. 181, 203 S.E. 2d 781 (1974). Assuming, *arguendo*, that a lay opinion as to the *cause* of a change in a defendant's mental state would nevertheless be incompetent, then the latter portion of Sheriff Blalock's testimony would be objectionable. However, we assume that when the court is the trier of fact, as is generally true on a pretrial motion, it will not consider incompetent evidence. *Brown v. Boger*, 263 N.C. 248, 139 S.E. 2d 577 (1965); *Bizzell v. Bizzell*, 247 N.C. 590, 101 S.E. 2d 668 (1958).

In a " 'hearing before the judge on a preliminary motion, the ordinary rules as to the competency of evidence applied in a trial before a jury are to some extent relaxed, for the reason that the judge with knowledge of the law is able to eliminate from the testimony he hears that which is immaterial and incompetent, and consider only that which tends properly to prove the facts to be found.' (Citations omitted.)" *State v. Davis*, 290 N.C. 511, 540, 227 S.E. 2d 97, 115 (1976). Absent affirmative evidence to the contrary, this Court presumes that the trial judge disregarded incompetent evidence in arriving at his decision. *State v. Davis, supra; Bizzell v. Bizzell, supra.*

With respect to the challenged testimony in the instant case Judge Walker made the following finding of fact:

"That he [Sheriff Blalock] did however notice recently a change in the defendant after he had been placed with several persons from either Central Prison or the Department of Correction System, inmates from the Department of Correction, and that the defendant had started rambling in his talk."

This finding was based solely on Sheriff Blalock's competent testimony. The trial court properly ignored the Sheriff's arguably incompetent statement of opinion which had earlier been admitted over defendant's objection. We note, however, that the safer practice is for the trial judge to adhere to the rules of

State v. Willard

evidence at a hearing on a pretrial motion. *State v. Davis, supra.* But where, as here, it does not affirmatively appear that the trial judge based his findings on the incompetent evidence the assignment of error will be overruled.

In his next two assignments of error, defendant contends the trial court erred in finding that he was mentally capable of standing trial.

[2-4] The test of a defendant's mental capacity to proceed to trial is whether he has the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to co-operate with his counsel to the end that any available defense may be interposed. *State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305 (1975) ; *State v. Jones,* 278 N.C. 259, 179 S.E. 2d 433 (1971) ; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560 (1968) ; *State v. Sullivan,* 229 N.C. 251, 49 S.E. 2d 458 (1948) ; 4 Strong's N. C. Index 3d, Criminal Law § 29 (1976). The issue may be determined by the trial court with or without the aid of a jury. *State v. Cooper, supra; State v. Propst, supra; State v. Sullivan, supra.* When the trial judge conducts the inquiry without a jury, the court's findings of fact, if supported by competent evidence, are conclusive on appeal. *State v. Cooper, supra; see State v. Thompson, supra.*

Defendant assails the court's conclusion that he was capable of standing trial because at the hearing on the motion (1) the most recent expert medical evidence indicated the defendant was mentally incapable of standing trial and (2) uncontradicted medical evidence showed the defendant suffered from amnesia regarding the events of the crime.

[5] The trial court's findings and conclusions as to the defendant's capacity to stand trial were supported by (1) defendant's score of 26 on the Competency Screening Test in November 1975, which was well within the range of competency to stand trial according to standards established by the National Institute of Mental Health; (2) Dr. James Groce's expert opinion that when he examined the defendant in November 1975, defendant was competent to stand trial; (3) the testimony of Sheriff Blalock, who observed the defendant in jail from the time of his arrest until trial (except for the periods he was at Dorothea Dix Hospital), which indicated that defendant was a normal prisoner and carried on normal conversations until recently

when he started "rambling in his talk" after he had been placed with some prisoners from Central Prison.

Dr. Groce's examination of defendant preceded Dr. Royal's examination by some nine months. Dr. Groce admitted he could not agree or disagree with Dr. Royal's opinions because they were based on data and a time period unavailable to him, and further admitted that defendant's competency could have changed since his examination. We would be inclined to agree with the defendant that the test data and Dr. Groce's examination were too remote in time to support the trial court's conclusion on defendant's competency to stand trial in light of Dr. Royal's examination but for Sheriff Blalock's observation that defendant's personality changed only after he was placed with other prisoners.

The trial court could reasonably have believed from all the evidence that the defendant decided, after coming in contact with other prisoners, that it was to his advantage to feign the auditory hallucinations and delusions which led to Dr. Royal's diagnosis of simple schizophrenia. It appears from the record that simple schizophrenia, combined with defendant's mild mental retardation and amnesia, were the basis for Dr. Royal's opinion that the defendant was incompetent to stand trial. Dr. Royal testified that schizophrenia, simple type, is a disease that comes on "insidiously or slowly so *there is not an acute sudden onset.*" (Emphasis supplied.) By contrast, Sheriff Blalock's testimony disclosed a *sudden* change in the defendant's personality. Dr. Royal also admitted that it was possible for defendant to fake the hallucinations. Under these circumstances, we think Judge Walker's findings and conclusions are sufficiently supported by the evidence and therefore, are conclusive on appeal. *State v. Cooper, supra.*

[6] Defendant's alleged amnesia concerning the events of the crime would not prevent him from comprehending his position and understanding the nature and object of the proceedings against him. Nor would his partial amnesia prevent him from conducting his defense in a rational manner or cooperating with his counsel in presenting any available defenses. Obviously if defendant is unable to recall the events of the crime, his available defenses may be limited. We do not believe this fact alone renders him incompetent to stand trial or denies him a fair trial in view of the fact that the State has the burden of proving

beyond a reasonable doubt that the crime charged was committed and that the defendant was the perpetrator. The general rule in other jurisdictions, which we adopt, is that amnesia does not *per se* render a defendant incapable of standing trial or of receiving a fair trial. Annot., 46 A.L.R. 3d 544, 553 (1972). *See, e.g.,, State v. McClendon,* 103 Ariz. 105, 437 P. 2d 421 (1968) ; *State v. Pugh,* 117 N.J. Super. 26, 283 A. 2d 537 (Super. Ct. App. Div. 1971), *cert. denied,* 60 N.J. 22, 285 A. 2d 563 (1972) ; *Cummins v. Price,* 421 Pa. 396, 218 A. 2d 758, *cert. denied,* 385 U.S. 869, 17 L.Ed. 2d 96, 87 S.Ct. 136 (1966). Partial amnesia places a defendant in no worse a position than the defendant who cannot remember where he was on a particular day because of the passage of time, or because he was insane, very intoxicated, completely drugged, or unconscious at the time. *Cummins v. Price, supra.* In each of these cases, the defendant's available defenses may be limited or impaired because of his present inability to reconstruct a past period of his life.

In deciding this same issue, the Arizona Supreme Court noted that, "amnesia 'is nothing more than a failure of memory concerning facts or events to which an individual has been exposed' and that 'every individual's memory process is marked by some distortion which may occur at any point' and 'as a result, *no one's memory is in fact complete, even under ideal conditions . . . every one is amnesic to some degree.'* (Emphasis supplied.) 71 Yale Law J. 109-111 (1961-62)." *State v. McClendon, supra* at 107, 437 P. 2d at 423. The Pennsylvania Supreme Court, in considering the issue which now confronts us, pointed out that, "[i]f in fact the condition of amnesia is *permanent,* defendant's contention (1) would require Courts to hold that such amnesia will permanently, completely and absolutely *negate all* criminal responsibility and (2) will turn over the determination of crime and criminal liability to psychiatrists, whose opinions are usually based in large part upon defendant's self-serving statements, instead of to Courts and juries, and (3) will greatly jeopardize the safety and security of law-abiding citizens and render the protection of Society from crime and criminals far, more difficult than ever before in modern history. (Emphasis in original.) *Cummins v. Price, supra* at 406, 218 A. 2d at 763.

We find the reasoning of our sister courts persuasive on this issue. We note that nothing in the record suggests that this defendant's alleged amnesia was merely a temporary condition,

a fact which might have influenced the court to delay the trial. *State v. McClendon, supra.* We have previously held on a related issue that amnesia is no defense to a criminal charge. *State v. Bock,* 288 N.C. 145, 217 S.E. 2d 513 (1975) ; *see State v. Caddell,* 287 N.C. 266, 215 S.E. 2d 348 (1975). The assignments of error relating to defendant's mental capacity to stand trial are overruled.

In his next assignment of error, defendant maintains the trial court erred by excluding certain medical testimony as to the mental condition of the defendant. Defendant argues that because the burden of proving insanity to the satisfaction of the jury rests upon him, he should be allowed to introduce any evidence bearing on his mental condition. We disagree.

[7] True, defendant has the burden of proving to the satisfaction of the jury that he was insane at the time the crime was committed. *State v. Harris,* 290 N.C. 718, 228 S.E. 2d 424 (1976) ; *State v. Hammonds, supra; State v. Caddell, supra.* This burden, however, is to show that defendant was insane *in a legal sense at the time of the crime. State v. Swink,* 229 N.C. 123, 47 S.E. 2d 852 (1948). The test of *legal* insanity asks whether, at the time the accused committed the act, he was laboring under such a defect of reason from disease of the mind as to be incapable of knowing the nature and quality of his act or, if he did know this, incapable of distinguishing between right and wrong in relation to such act. *State v. Harris, supra; State v. Cooper, supra; State v. Swink, supra.* It follows that a defendant who pleads insanity in bar to a criminal charge is only entitled to introduce evidence relevant to the issue of *legal* insanity.

[8] Defendant complains that Dr. Royal was not allowed to testify at trial concerning his findings of schizophrenia, simple type, and alcohol pathological intoxication. Dr. Royal was permitted to give the following testimony:

"I am not able to state whether or not he [defendant] knew right from wrong at the time that the crime was committed . . .

"I am not able to state because the charged person indicated and has indicated consistently amnesia for the time of the alleged crime and so that is an area that we were unable to discuss. My thought is that he was operating

State v. Willard

under a psychotic condition and at times those people are able to determine right from wrong even when psychotic, but unless you interview the person at the time that they are in that condition that is impossible to say with certainty.

"A psychotic condition generally means a deranged mind within which a person has certain thought processes going on that are unrealistic."

Thus, it appears the doctor was allowed to state his opinion that the defendant was suffering from some type of psychosis at the time of the crime. The fact that the doctor was not permitted to place a label on the specific type of psychosis would not be reversible error. We also note that no proper foundation for the doctor's opinions as to simple schizophrenia and alcohol pathological intoxication was laid and thus the objections to this testimony were properly sustained. *State v. Bock, supra.* The doctor did state that he was unable to form an opinion as to whether the defendant knew right from wrong at the time of the crime, which was the relevant consideration. This assignment of error is overruled.

[9] Defendant next challenges the constitutionality of the test for legal insanity in this State, the so-called "M'Naghten Rule." M'Naghten's Case, 10 Cl. & Fin. 200 (H.L. 1843). Defendant concedes that our Court has on many occasions rejected this argument, *see e.g., State v. Harris, supra,* and that the only United States Supreme Court decision on point is contra to his position. *Leland v. Oregon,* 343 U.S. 790, 96 L.Ed. 1302, 72 S.Ct. 1002 (1952). Defendant nevertheless asks this Court to reconsider the issue. Suffice it to say, that we have adhered to the "right and wrong" [M'Naghten] test for many years and are not disposed to depart from it now. *State v. Harris, supra; State v. Hammonds, supra; State v. Wetmore,* 287 N.C. 344, 215 S.E. 2d 51 (1975); *State v. Cooper, supra.* This assignment of error is overruled.

Lastly, defendant claims the court erred when it refused to grant defendant's motion to set aside the verdict as being against the greater weight of the evidence. At motion to set aside the verdict as being contrary to the greater weight of the evidence is addressed to the discretion of the trial court and is not reviewable on appeal. *State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335 (1975); *State v. Moore,* 279 N.C. 455, 183 S.E. 2d 546

(1971) ; *State v. Mason*, 279 N.C. 435, 183 S.E. 2d 661 (1971). The assignment of error is without merit and overruled.

Due to the serious nature of the offenses charged, we have searched the record for errors other than those assigned and have found none.

In the trial we find

No error.