STATE OF NORTH CAROLINA v. LEROY CLARK, JR.

No. 64

(Filed 6 May 1980)

1. Criminal Law § 29— defendant's mental capacity to stand trial—sufficiency of evidence

Evidence, though conflicting, was sufficient to support the trial court's ruling that defendant was capable of proceeding to trial where the evidence consisted of testimony by defendant's sister and two psychiatrists; the sister testified to defendant's strange behavior; one psychiatrist testified that defendant was a paranoid schizophrenic and did not have the capacity to proceed to trial; the witness based his opinion upon an interview with defendant and particularly upon defendant's refusal to discuss the murder with which he was charged; the second psychiatrist had several interviews with defendant and found him uncommunicative; the psychiatrist testified that defendant was very aware of the murder charge pending against him and indicated that he would not plea bargain but would plead self-defense; and the witness concluded that defendant understood it was wrong for him to stab his father and that he was capable of proceeding to trial.

2. Criminal Law § 29— mental capacity to stand trial—test

The test of a defendant's mental capacity to proceed to trial is whether he has, at the time of trial, the mental capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed.

State v. Clark

**3. Criminal Law § 87.1— leading questions**

   There was no merit to defendant's contention that the trial court erred in permitting the State to ask leading questions, since the district attorney was merely directing the witnesses' attention to the subject matter at hand in a manner best calculated to elicit the truth; moreover, the information so obtained was admitted without objection at other points in the witnesses' testimony and defendant therefore was not prejudiced.

**4. Criminal Law § 86.4— cross-examination about defendant's prior conviction—no prejudice shown**

   Defendant did not show error in the trial court's failure to instruct the jury to disregard the district attorney's cross-examination of defendant concerning whether he had ever been convicted of homicide, since defendant failed to object at the time of the question; defendant's assignment of error failed to comply with the Rules of Appellate Procedure in that defendant did not show what question was asked; defendant made no showing as to whether the district attorney acted in good faith in inquiring into defendant's prior criminal offenses or reprehensible conduct and the court's ruling permitting the question is therefore presumed to be correct; and any possible prejudice to defendant was negated by the fact that he was given the opportunity to explain that he had not been convicted of homicide.

APPEAL by defendant from *Strickland, J.*, 13 September 1979 Criminal Session of BEAUFORT Superior Court.

Defendant was charged in an indictment proper in form with the murder of his father, Leroy Clark, Sr. He entered a plea of not guilty and filed a motion pursuant to G.S. 15A-959 giving notice of his intention to rely on the defense of insanity.

Prior to the selection of the jury, counsel for defendant filed a motion questioning defendant's capacity to proceed to trial. A hearing was held on that motion in accordance with G.S. 15A-1002(b)(3) at which testimony was presented by both the defendant and the State. The trial judge held that defendant was competent to proceed to trial.

At trial the State offered evidence tending to show that on 7 March 1979 defendant was living with his father in Belhaven, North Carolina and had been visiting there since early January of that year. On the afternoon of March 7, defendant was in the yard cleaning fish with a long knife and his father was inside his mobile home cooking fish.

Allen Winfield testified that he was a neighbor of Leroy Clark, Sr. and on that afternoon, he was in the yard and observed

defendant take some fish to his father inside the trailer. At that time, he heard the sound of something falling. Defendant came outside to get a mop, and the witness saw chicken gravy spilled on the floor. After defendant went back inside the mobile home and closed the door, Winfield heard defendant's father exclaim, "You're cutting me, stop cutting me." The witness ran to the door of the trailer and, upon finding it locked, went to a nearby window where he observed defendant striking his father in the side with a knife similar to the one he had used for cleaning fish. The witness then left and called the police. After Officer O'Neal arrived, defendant came out of the trailer with blood on his pants and sleeves and stated that "everything is all right." The witness at that time observed the bloody body of Leroy Clark, Sr. lying on the floor. The witness Winfield further testified that he had never heard defendant talk about things that did not make sense.

Captain Willie O'Neal of the Belhaven Police Department testified that he went to the trailer in response to Mr. Winfield's call. As he approached the trailer, defendant came out and told him that there had been a conspiracy of two people and that the other person was inside the trailer. Captain O'Neal then looked inside and saw defendant's father lying on the floor in a pool of blood. Defendant was bloody from his chest to his shoes. When the officer told him that he would have to be taken to the police station, defendant said he understood because he himself was an F.B.I. agent. As they walked to the car, Captain O'Neal asked him if he had stabbed his father, and defendant answered that he had. A later search of the trailer revealed blood in the tub area and on the towel rack and a bloody knife found approximately eight to ten feet from the body. At the police station, Captain O'Neal found some money in defendant's pocket which had blood on it. After defendant had been advised of his rights, the officer again asked defendant if he had stabbed his father, and he responded that he had.

Dr. Lawrence Harris, a forensic pathologist, testified for the State that he performed an autopsy upon the body of the deceased on 8 March 1979 indicating that the deceased had recently suffered eight stab wounds and one incised wound. The fatal injury was a deep stab wound in the chest which penetrated the heart at the aorta.

Defendant took the witness stand in his own behalf and testified that he was an F.B.I. agent with badge number zero. He had lived in New York prior to January 1979, but he was born in Africa on "the first year, the first day, the first month, three-one-one-one." He denied having a mother or any sisters. He claimed to be Leroy Clark, Sr. and that he had come to Belhaven to investigate his "son," the victim of the stabbing. Defendant stated that he was thirty-nine years old while his son was thirty-eight, and that this was possible because his son "was born in three months," on thirteen-twelve-one.

Defendant testified further that on 7 March 1979, he was cleaning fish when he had a quarrel with his "son" concerning who owned the trailer and some property in Belhaven. His "son" had formed a conspiracy to take this property away from him and was trying to tell defendant that he was not his son but was really his father. Defendant became upset and hit him in the face several times. Defendant went outside to get a mop and was trying to get blood off the floor when his "son" grabbed the knife defendant had been using to clean fish and told defendant he was going to kill him. The two men struggled and fell to the floor. Defendant wrestled the knife away from his "son" and stabbed him several times.

On cross-examination defendant testified that in New York he had been convicted twenty-five times of burglary "of my property" as well as of other crimes. Defendant stabbed his "son" to protect himself and subsequently took money out of his "son's" pocket because it really belonged to defendant.

Gertrude Clark, defendant's sister, testified as to his unusual behavior during recent years.

Dr. Phillip Nelson, a psychiatrist, testified that in his opinion defendant was a paranoid schizophrenic for whom the prognosis was "guarded." In his opinion, defendant might have had a psychotic break and therefore would not have known right from wrong at the time of the stabbing.

Dr. Mary M. Rood, a forensic psychiatrist, testified for the State in rebuttal that in her opinion defendant knew right from wrong, knew the quality and nature of his acts at the time of the killing, and was capable of proceeding to trial.

The testimony of Gertrude Clark, Dr. Phillip Nelson and Dr. Mary M. Rood regarding defendant's mental condition was substantially the same at trial as that given at the pretrial hearing. A more detailed statement of that testimony will be set forth in our consideration of defendant's assignments of error.

Defendant was recalled by the State and testified that he knew it was wrong to stab his father, but that he did so in self-defense.

The jury returned a verdict of guilty of first-degree murder and recommended that defendant be sentenced to life imprisonment. The trial court imposed a sentence of life imprisonment, and defendant appealed.

*Rufus L. Edmisten, Attorney General, by Jane Rankin Thompson, Assistant Attorney General, for the State.*

*Franklin B. Johnston for defendant appellant.*

BRANCH, Chief Justice.

[1] Defendant first assigns as error the trial judge's ruling that defendant was capable of proceeding to trial.

At the pretrial hearing held pursuant to G.S. 15A-1002(b)(3), defendant offered the testimony of his sister, Gertrude Clark, who stated that she had grown up with defendant and had continued to see him frequently over the years. For the past several years, she had noticed a change in his behavior. He began to talk about strange things such as his wife and children when he apparently had neither. In the fall of 1978, he tried to jump off the Brooklyn Bridge and was taken to a New York hospital for treatment which continued for about two months. He was again hospitalized after he had attempted to molest a nephew. The witness testified that defendant was still acting strangely when he went to visit his father in January, 1979. On cross-examination she said that her brother had spent most of his adult life in prison. At his father's funeral, defendant had told her he did not know that his father was dead.

Dr. Phillip Nelson, an expert in psychiatry, testified that he examined defendant on 24 June 1979 in the Beaufort County jail. At that time, he had read a psychiatric report from Manhattan-

State v. Clark

Meyer Hospital in New York in which defendant was described as being alert and lucid although he had a delusional thinking process. That report diagnosed defendant's condition as being "paranoid schizophrenic, [with] habitual heavy drinking and drug dependence." Dr. Nelson testified that when he interviewed defendant he denied ever being in a hospital or having a criminal record. Defendant appeared to be very disturbed about the fact that his attorney could not get him out on bail and stated that he wanted another attorney for this reason. He did not appear to have any concept of the seriousness of his situation or understand the nature of the charges against him. Further, he was uncooperative and refused to discuss the circumstances surrounding the pending charges, stating that he would discuss this with his attorney. Dr. Nelson stated that in his opinion defendant was a paranoid schizophrenic and a person suffering with this disease could become violently dangerous when certain stimuli triggered a psychotic episode. He testified that, assuming that defendant was experiencing such an episode at the time of the stabbing, he would not have understood the nature of what he was doing or have been able to distinguish between right and wrong. The witness concluded that defendant did not have the capacity to proceed to trial, basing this upon his interview and particularly upon defendant's refusal to discuss the stabbing of his father.

The State offered the testimony of Dr. Mary M. Rood, a forensic psychiatrist at Dorothea Dix Hospital, who had examined defendant for the purpose of determining whether he was capable of proceeding to trial. She observed defendant over a period of thirteen days in March, 1979. Her initial interview lasted for about twenty minutes, and she had several subsequent interviews with him. She observed no outward evidence of mental illness, and in her opinion he was basically normal but tended to be uncommunicative and distrustful of others. In her opinion, in March 1979, defendant was not a paranoid schizophrenic but rather was a paranoid personality. He was very aware of the first-degree murder charge pending against him and indicated that he would not plea bargain but would plead self-defense. She concluded that he understood it was wrong for him to stab his father and that he was capable of proceeding to trial.

At the close of the pretrial hearing, the trial judge made the following findings of fact and conclusions of law:

1. That the defendant, Leroy Clark, Jr., was admitted to the Dorothea Dix Hospital on March 13, 1979 and remained there through March 26, 1979; that the defendant was interviewed on some occasion by a forensic psychiatrist and observed on other occasions; that the defendant was not communicative and that his history and responses to answers were unreliable; that the defendant previously had been admitted to the Manhattan-Meyer Hospital in New York on or about October 12, 1977, where he was diagnosed as being alert and lucid, but in a delusional process, suffering from drug dependence and habitual drinking, and he was diagnosed as being a paranoid schizophrenic; that on June 24, 1979, the defendant advised one Dr. Nelson, a psychiatrist, during an examination, that he wanted to get out of jail on bail and wanted to discharge his attorney, because he was not out of jail; that the defendant, during his stay at Dorothea Dix hospital, adjusted well to his surroundings and had no difficulty with other people; that the defendant was well aware that he was indicted on a first degree murder charge, but would not plea bargain and stated that he could plead self-defense.

Based upon the above findings of fact, the Court makes the following conclusion of law:

1. That the defendant has paranoid personality, precipitated by drugs and alcohol and may have psychotic episodes.

2. That the defendant is . . . mentally capable of proceeding with trial and assisting his counsel in the preparation and trial of his case.

It is therefore the ruling of the Court that the defendant has the capacity to proceed with trial.

[2]  The test of a defendant's mental capacity to proceed to trial is whether he has, at the time of trial, the mental capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed. *State v. Willard*, 292 N.C. 567, 234 S.E. 2d 587 (1977); *State v. Cooper*, 286 N.C. 549, 213 S.E.

2d 305 (1975); *State v. Potter*, 285 N.C. 238, 204 S.E. 2d 649 (1974); *State v. Jones*, 278 N.C. 259, 179 S.E. 2d 433 (1971). The issue may be determined by the trial court with or without the aid of the jury. *State v. Cooper, supra; State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (1968). When the trial judge, as here, conducts the inquiry without a jury, the court's findings of fact, if supported by competent evidence, are conclusive on appeal. *State v. Willard, supra; State v. Thompson*, 285 N.C. 181, 203 S.E. 2d 781, *cert. denied*, 419 U.S. 867 (1974).

Although the evidence as to defendant's mental capacity to proceed to trial was in conflict, we are of the opinion and so hold that there was ample evidence to support the trial judge's findings and the findings in turn support the court's conclusions of law and ruling. Thus, the trial court correctly ruled that defendant had the capacity to proceed to trial.

[3] Defendant next contends that the trial judge erred in allowing the State to ask certain leading questions on direct examination.

A leading question has been defined as one which suggests the answer desired and is a question which may often be answered by "yes" or "no." *State v. Manuel*, 291 N.C. 705, 231 S.E. 2d 588 (1977); *State v. Greene*, 285 N.C. 482, 206 S.E. 2d 229 (1974); 1 Stansbury's North Carolina Evidence § 31 (Brandis rev. 1973). This Court has held that the trial judge has discretionary authority to permit leading questions in proper instances, and such discretionary action on the part of the trial judge will not be disturbed absent a showing of abuse of discretion. *State v. Manuel, supra; State v. Cranfield*, 238 N.C. 110, 76 S.E. 2d 353 (1953).

Our examination of the challenged rulings discloses no abuse of discretion on the part of the trial judge. To the contrary, it appears that the district attorney was merely directing the witnesses' attention to the subject matter at hand in a manner best calculated to elicit the truth. *State v. Smith*, 290 N.C. 148, 226 S.E. 2d 10, *cert. denied*, 429 U.S. 932 (1976); *State v. Greene, supra*. Moreover, the information so obtained was admitted without objection at other points in the witnesses' testimony and thus defendant was not prejudiced thereby. *State v. Manuel, supra*. This assignment of error is overruled.

**[4]** Defendant next assigns as error the failure of the trial judge to instruct the jury to disregard the district attorney's cross-examination of defendant concerning whether he had ever been convicted of homicide.

In *State v. Foster*, 293 N.C. 674, 239 S.E. 2d 449 (1977), we considered the scope and nature of cross-examination when a defendant elects to become a witness and testify in his own behalf. There Chief Justice Sharp wrote:

> A defendant who elects to testify in his own behalf knows that he is subject to impeachment by questions relating not only to his conviction of crime but also to any criminal or degrading act which tends to discredit his character and challenge his credibility. Such questions, however, must be asked in good faith. It would be highly improper for the prosecuting attorney to ask a witness an impeaching question without reasonable grounds for belief that the witness had committed the crime or degrading act about which he was inquiring. *State v. Williams*, 292 N.C. 391, 233 S.E. 2d 507 (1977); *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated*, 429 U.S. 912, 97 S.Ct. 301, 50 L.Ed. 2d 278 (1976); *State v. Gainey*, 280 N.C. 366, 185 S.E. 2d 874 (1972); *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971). *See* 1 Stansbury's N.C. Evidence § 112 (Brandis rev. 1973).
>
> Whether the cross-examination transcends propriety or is unfair is a matter resting largely in the sole discretion of the trial judge, who sees and hears the witnesses and knows the background of the case. His ruling thereon will not be disturbed without a showing of gross abuse of discretion. *State v. Daye*, 281 N.C. 592, 189 S.E. 2d 481 (1972).

*Id.* at 684-85, 239 S.E. 2d at 456-57.

These rules do not conflict with our decision in *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971), in which we held that a witness including a criminal defendant may not be impeached on cross-examination by questions concerning whether he had been *arrested, accused* or *indicted* for a criminal offense other than that for which he is then on trial.

We initially note that in the case *sub judice*, defendant failed to object at the time of the question but subsequently entered an objection "to the District Attorney's questioning of the defendant as to whether or not he had been convicted of homicide anywhere" on the ground that the district attorney had before him an F.B.I. report showing that defendant had been charged but not convicted of homicide. Such an assignment of error is not in compliance with Rule 9(c)(1) of the Rules of Appellate Procedure which requires that "[w]here error is assigned with respect to the admission or exclusion of evidence, the question and answer form shall be utilized in setting out the pertinent questions and answers." In its present state, the record does not disclose what question was asked so as to permit an intelligent ruling on its propriety.

Even had defendant been in compliance with the rule, the record does not support his contention that the district attorney acted in bad faith. The F.B.I. report was not made a part of the record, and defendant failed to request a *voir dire* to determine whether the district attorney acted in good faith. We have held that when the record contains no evidence regarding whether a district attorney acted in good faith in inquiring into a defendant's prior criminal offenses or reprehensible conduct, the court's ruling permitting the question to be asked will be presumed to be correct. *State v. McLean*, 294 N.C. 623, 242 S.E. 2d 814 (1978). Furthermore, any possible prejudice to defendant was negated by the fact that he was given the opportunity to explain that he had not been convicted of homicide. *State v. McLean, supra*. We find no merit in this assignment of error.

Finally, defendant assigns as error the trial judge's denial of his motion for dismissal. Defendant argues that his motion should have been allowed because of overwhelming evidence that he was not mentally competent to proceed to trial and that he was legally insane at the time of the fatal stabbing. We disagree.

It is well settled that upon a motion to dismiss or a motion for judgment as of nonsuit, the evidence must be considered in the light most favorable to the State and the State must be given the benefit of every reasonable inference to be drawn therefrom. *State v. Glover*, 270 N.C. 319, 154 S.E. 2d 305 (1967). Applying the well-known rules governing a motion to dismiss, we are of the

opinion that here the evidence was sufficient to withstand defendant's motion.

We have carefully considered this entire record and find no error warranting a new trial.

No error.