STATE OF NORTH CAROLINA v. JOHN STERLING GARDNER, JR.

No. 29A84

(Filed 28 August 1984)

**1. Criminal Law § 15.1— denial of pretrial motion for change of venue—failure to show abuse of discretion**

In a prosecution for first-degree murder, defendant failed to show the trial court abused its discretion in failing to grant his motion for a change of venue pursuant to G.S. 15A-957. While the media coverage of the crimes committed in the case was pervasive, the articles appearing in local newspapers and the broadcasts on local radio and television stations were factual and non-inflammatory news accounts of the murders. Further, defendant exercised only half of his available peremptory challenges to the jury, and the transcript of the jury selection process revealed that while numerous jurors had heard about the case through television or newspaper accounts of the killings, only one juror had tentatively formed an opinion about defendant's guilt and that juror was immediately excused by defense counsel.

**2. Constitutional Law § 31— denial of funds for private investigator—no abuse of discretion**

The trial judge did not abuse his discretion in failing to appoint a private investigator for defendant pursuant to G.S. 7A-450(b) and G.S. 7A-454 where the gist of defendant's argument was that a private investigator would be helpful as a witness coordinator and would be useful in determining which witnesses should be called to establish defendant's alibi defense, and such an assertion did not rise to the level of showing a reasonable likelihood that the efforts of an investigator would discover additional evidence helpful to defendant.

**3. Constitutional Law § 31— denial of motion for funds to hire private psychiatrist—no abuse of discretion**

The trial judge correctly denied defendant's motion for funds to pay for additional psychiatric testing where there was no serious contention that defendant lacked the capacity to stand trial or was insane at the time he allegedly committed the offenses, and where defendant did not meet his burden of showing a reasonable likelihood that the expert would materially aid in the preparation of the case.

**4. Constitutional Law § 63— exclusion of jurors opposed to death penalty—no violation of Witherspoon principles**

In a prosecution for first-degree murder, all jurors excused for cause as being opposed to the death penalty were properly excluded under the requirements of *Witherspoon v. Illinois*, 391 U.S. 510 (1978) and G.S. 15A-1212(8). Each one of them emphatically stated that under no circumstances would he or she return a verdict of death.

5. **Constitutional Law § 62— no impermissible restriction of voir dire of prospective jurors by defense counsel**

There was no impermissible restriction of *voir dire* of prospective jurors by defense counsel by the refusal of the trial court to permit defense counsel to require prospective jurors to name the three persons, living or dead, that person most admired.

6. **Criminal Law § 75.1— confession—not result of "fruit of poisonous tree"**

Defendant's confession was not obtained in violation of *Dunaway v. New York*, 442 U.S. 200 and was properly not suppressed as "the fruit of the poisonous tree" where defendant was already in custody and hence there was no seizure within the meaning of the Fourth Amendment, and where the trial court specifically concluded, upon ample supporting evidence, that the officers had "probable cause to interrogate the defendant."

7. **Criminal Law § 75.2— confession—made freely, voluntarily and after knowingly waiving rights**

The trial court properly found that defendant's statement was made freely, voluntarily and after knowingly waiving his *Miranda* rights where the trial court specifically found that an officer only promised defendant to be present at defendant's trial and that defendant's cooperation would be communicated to the district attorney.

8. **Constitutional Law § 30— disclosure of statements pursuant to voluntary discovery—no evidence of violation of discovery provisions**

In a prosecution for first-degree murder, it was not evident from the record or from defendant's brief that there was a violation of the discovery provisions concerning production of statements made by defendant. However, assuming that a statement was not provided as required by G.S. 15A-903(a), it was inconceivable that it could have been sufficiently prejudicial as to warrant awarding defendant a new trial and defendant failed to show any abuse of discretion in the failure of the trial judge to impose sanctions pursuant to G.S. 15A-910 assuming there was a violation of discovery provisions.

9. **Criminal Law § 114.2— instructions—no expression of opinion in instructions concerning defendant's contentions and theory of aiding and abetting**

There was no merit to defendant's contention that the trial court improperly expressed an opinion in its charge to the jury concerning defendant's first written statement in which he contended another person committed the robbery and murder since the judge's charge was supported by the evidence and was accurate and fair in every respect.

10. **Criminal Law § 66.9— denial of motion to suppress identification testimony— proper**

The uncontested findings of a trial judge concerning identification of defendant were amply supported by the evidence and the findings in turn supported the trial court's conclusion that the pretrial procedures were not impermissibly suggestive where the trial judge found that a witness had been shown approximately 100 photographs to see if she could identify the person seen by her shortly after the murders were committed, and where approximately a year after the murders, the witness was shown 6 color photographs, each bear-

State v. Gardner

ing a picture of a white male approximately of the same age, each wearing a beard, each showing full face, and where the witness examined the photographs, discarded 3; of the remaining 3, she discarded one; of the remaining 2, she discarded one and selected the photograph of the defendant as being a photograph of the person she had seen in the parking lot shortly after the robbery and murders.

11. **Criminal Law § 86.5— cross-examination concerning alleged participation in unrelated murder—proper**

In a prosecution for first-degree murder, the trial court properly allowed the prosecutor to cross-examine defendant concerning his alleged participation in an unrelated murder where defendant took the stand to testify in his own behalf, and where there was no evidence or even suggestion of lack of good faith on the part of the prosecutor.

12. **Criminal Law § 102— closing argument of prosecutor—no impropriety requiring trial judge to act ex mero motu**

There was nothing so grossly improper about a prosecutor's closing argument in the guilt phase of a prosecution for first-degree murder so as to have required corrective action by the trial judge *ex mero motu.*

13. **Criminal Law § 42.4— evidence that defendant seen with sawed-off shotgun relevant**

In a prosecution for first-degree murder, evidence that defendant possessed a weapon similar to that used in the murders shortly after the murders occurred was relevant evidence.

14. **Criminal Law § 135.8— aggravating factor that murder committed for pecuniary gain properly submitted**

In a prosecution for first-degree murder, there was no error in the submission of the aggravating factor that the murder was committed for pecuniary gain. The 1983 legislative amendment to the Fair Sentencing Act's pecuniary gain provision, G.S. 15A-1340.4(a)(1)c, does not dictate redefinition of the pecuniary gain aggravating factor found in the death penalty statutes, G.S. 15A-2000(e)(6).

15. **Criminal Law § 135.9— no error in failing to find age as mitigating factor**

The trial court properly failed to give a peremptory instruction that defendant's age must be considered as a mitigating circumstance where defendant was 24 years old at the time of the commission of the murders for which he was charged and where the trial judge submitted to the jury the age of defendant as a possible mitigating circumstance for their consideration which the jury failed to find.

16. **Criminal Law § 135.10— death sentence—proportionality review**

In comparing a first-degree murder case to similar cases in which the death penalty was imposed, the Court could not find that the sentence of death in this case was disproportionate or excessive, considering both the crime and the defendant where the killings in this case were part of a violent course of conduct, were coldblooded, calculated, and senseless. G.S. 15A-2000(d)(2).

APPEAL by defendant from *Fountain, Judge,* at the 19 September 1983 Session of FORSYTH Superior Court.

Defendant was charged in indictments, proper in form, with the first-degree murder of Richard Augustus Adams and the first-degree murder of Delphina Kim Miller. Each indictment alleged felony murder as the basis for the first-degree murder charge. Defendant entered a plea of not guilty to each offense.

At trial, the State offered evidence tending to show that on 22 December 1982, Richard Adams and Kim Miller were employed by the Steak and Ale Restaurant on Stratford Road in Winston-Salem, North Carolina. Richard, a 21-year-old, had been a management trainee with the company for four months. Kim, who was 23 years old, worked as a bartender at the restaurant.

On the evening of 22 December, Patricia Coyle, the Assistant Manager of the Stratford Road Steak and Ale, left the restaurant at about 10:00 p.m. She returned to the restaurant later that night to check on Richard, who was still training under her supervision.

That evening, Richard was responsible for closing the restaurant, adding the cash and balancing the receipts. The standard procedure was for the closing manager to add the money and place it on the side of the desk in the restaurant office until all charges were balanced. Only then was the money to be placed in the safe.

Ms. Coyle testified that shortly after 12:00 a.m. she again left the restaurant. When she left, Kim was in the bar and Richard was sitting in the office talking with one of the waitresses, Audrey Little.

Ms. Little recalled that when she left the restaurant at 12:20 a.m., Kim was polishing the bar. Richard walked Audrey through the kitchen and watched her cross the parking lot to make sure she got to her car safely. After Audrey's departure, Kim and Richard were the only employees remaining at the Steak and Ale.

At approximately 9:00 a.m. the next morning, Patricia Coyle arrived to open the restaurant. She noticed that the sign was still on and Richard's car was still parked where it had been the night before. She opened the door to let in several employees who were

waiting outside and saw that the lights in the dining room were dim and the music was still on. She then walked through the restaurant to the office in the back and there discovered the bodies of Richard Adams and Kim Miller. Richard had been shot in the face with a shotgun and was slumped back in a chair against the wall. Kim had been shot in the back of the neck and was lying on the floor at Richard's feet. The money from the day's earnings was missing and the manager, by using the figures from the adding machine tapes Richard was working on when he was killed, determined that $2,696.55 in cash had been taken.

The State also presented the testimony of Linda Cain. She was a cashier at the Kyoto Steak House which was located next door to the Steak and Ale. Ms. Cain stated that sometime between 12:15 a.m. and 12:30 a.m. on 23 December, she was walking to her car after work when she heard what sounded like a loud bang coming from the direction of the Steak and Ale. She continued walking toward her car when she suddenly heard footsteps behind her. She looked over her shoulder and saw a man, later identified as defendant, running to an automobile parked in back of the Steak and Ale. She testified that she stared at the man for a few moments before he jumped into the passenger side of the vehicle. The driver of the bluish-grey or beige older model vehicle then backed hurriedly out of the parking lot.

On 24 March 1983, the witness Cain was presented with a photographic array from which she selected defendant's photograph and identified him as the man she saw in the Steak and Ale parking lot during the early morning of 23 December. Prior to 24 March, Ms. Cain had been shown approximately 100 photographs from which she was asked to identify the man she had earlier seen. She did not select any of these photos but was able to positively identify defendant's picture when the officers exhibited it to her.

The State offered additional evidence tending to implicate defendant in the commission of the crimes charged. On 17 March 1983, Jeffrey Scott Royal, a prisoner in the Forsyth County jail, approached Detective Robert Lloyd, indicating that he had information relating to the Steak and Ale homicides. Royal told Detective Lloyd that one evening in January, 1983, defendant was at Royal's residence when a Crimestopper broadcast about the

murders committed at the Steak and Ale came on the television. Royal stated that defendant said the police "sure would like to know what he knew about the crimes." Defendant then told Royal that he would "like to get another lick (robbery) like the one at the Steak and Ale" and that he "got over two thousand dollars out of Steak and Ale." Finally, Royal informed Detective Lloyd that defendant had a .20 gauge sawed-off shotgun with him at the Royal residence that day.

At the time Royal gave this information to police, defendant was being held prisoner in the Forsyth County jail on an unrelated armed robbery charge. On 23 March, Detective Lloyd brought defendant from the jail to the Winston-Salem Police Department for questioning. After signing a written waiver of his constitutional rights, defendant confessed to his involvement in the Steak and Ale murders. In this statement, defendant admitted that he was at the scene of the crime, but stated that he merely drove the getaway car for a friend. He maintained that he had no knowledge of the killings until his friend climbed back into the car following the robbery. The detectives then drove defendant to the Steak and Ale and asked him to describe more fully his role in the crimes committed on 23 December.

When they returned to the police department, defendant was placed in an office to await further questioning and was left alone for a few minutes. Detective Mike Branscome testified that as he walked by, defendant motioned him to come into the office. Defendant asked Branscome what he thought about defendant's situation and Branscome replied: "I believe you're the one that killed those people." Defendant then said he wished to make another statement and consented to have it tape-recorded.

In this second statement, defendant confessed that he had in fact entered the Steak and Ale Restaurant. He stated that he gained entry to the establishment by ringing the back door and forcing it open when Kim Miller answered the bell. He recalled that he forced Kim into the office and told her to hand over the cash. Defendant said that he then noticed Richard begin to get out of his chair. He thought Richard had something in his hand, perhaps a weapon, so defendant fired his gun at him. Defendant then shot Kim, picked up the shells which he had ejected from his sawed-off shotgun and ran out to his vehicle where an accomplice

was waiting. Defendant stated that he and his friend split the money. Finally, defendant told the police that he and his companion had been injecting "crystal meth" into their arms earlier that evening.

Defendant presented evidence in the nature of an alibi. Greg Teel, who in December 1982 was living with defendant and his girl friend, Cathy Lynn Giordano, testified that defendant was with him throughout the evening of 22 December. He stated that at about 6:00 p.m. that evening, he rode with defendant to take Cathy to work. He remembered that he and defendant then went back home and remained there until 9:00 or 10:00 o'clock, when they left to go to Greg's former girl friend's house. They visited with her for about 45 minutes, and then went to Bill's Truck Stop in Lexington, North Carolina, to get something to eat and to play the video games. At 12:00 or 12:30 a.m., defendant and Greg went to pick Cathy up at work. They then returned to Bill's Truck Stop to get something for Cathy to eat and then went home.

Cathy Giordano's testimony was corroborative of this sequence of events. She testified that when they went home after eating at Bill's Truck Stop, defendant immediately went to bed and remained at the apartment throughout the night.

Defendant testified in his own behalf. He stated that he was with Greg and Cathy on 22 and 23 December 1982. He denied any involvement in the Steak and Ale murders and stated that the officers had used threats and promises to obtain his confessions.

The jury convicted defendant of the first-degree murder of Richard Adams and the first-degree murder of Kim Miller.

A sentencing hearing was held pursuant to G.S. 15A-2000 *et seq.*, following the first-degree murder convictions.

The State presented no evidence during the sentencing phase of the trial, electing to rely on its evidence presented during the guilt determination phase.

Defendant presented the testimony of Dr. Mary Rood, a psychiatrist at Dorothea Dix Hospital. She testified that she examined defendant on 16 May 1983. Her diagnosis was that defendant suffered from anti-social behavior and a personality disorder manifested by drug abuse. She specifically stated, however, that,

in her opinion, defendant's capacity to conform his behavior to the requirements of the law was not impaired. She further offered her opinion that defendant was capable of distinguishing right from wrong.

At the conclusion of the sentencing hearing, the trial court submitted two aggravating circumstances with respect to each conviction:

1. Was the capital felony committed for pecuniary gain?

2. Was the murder for which the defendant stands convicted part of a course of conduct in which the defendant engaged and which included the commission by the defendant of another crime of violence against another person?

The trial court submitted the following mitigating circumstances relating to each murder conviction:

1. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

2. The age of the defendant at the time of the crime.

3. Other circumstances arising from the evidence which the jury deems to have mitigating value.

    a. The defendant's prior family history that would reasonably be expected to contribute to the defendant's criminal conduct.

    b. The defendant's apparent drug addiction or abuse and alcoholism or alcohol abuse that would reasonably be expected to contribute to the defendant's criminal conduct.

With respect to each offense, the jury found beyond a reasonable doubt that both aggravating circumstances existed.

The jury also found the existence of two mitigating circumstances, those relating to defendant's prior family history and his drug and alcohol abuse. The jury specifically rejected the mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct was impaired. They also found that defendant's age at the time of the crimes was not of mitigating value.

Finally, the jury found beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstances, and recommended that defendant be sentenced to death.

The trial court sentenced defendant to die for the first-degree murder of Richard Augustus Adams and for the first-degree murder of Delphina Kim Miller. Defendant appealed his death sentences directly to this Court pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by Joan H. Byers, Assistant Attorney General, for the State.*

*Bruce C. Fraser for defendant-appellant.*

BRANCH, Chief Justice.

[1] Defendant first assigns as error the denial of his pretrial motion for change of venue. He asserts that extensive media coverage of the "Steak and Ale" murders was highly prejudicial and precluded his receiving a fair trial in Forsyth County.

On a motion for change of venue pursuant to G.S. 15A-957, the burden is on the defendant to prove prejudice so great that he cannot obtain a fair and impartial trial. *State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339 (1983); *State v. Dobbins*, 306 N.C. 342, 293 S.E. 2d 162 (1982). He must show that "it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." *State v. Jerrett*, 309 N.C. at 255, 307 S.E. 2d at 347. The determination of whether the defendant has met this burden of proof rests in the sound discretion of the trial judge and his ruling will not be overturned on appeal absent a showing of gross abuse of discretion. *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981).

Our review of the record reveals that defendant has shown no abuse of discretion in the trial court's denial of the motion for change of venue.

While the media coverage of the crimes committed in the instant case was, as defendant alleges, pervasive, the articles ap-

pearing in local newspapers and the broadcasts on local radio and television stations were factual and non-inflammatory news accounts of the murders. This Court has consistently held that factual news accounts regarding the commission of a crime and the pretrial proceedings do not of themselves warrant a change of venue. *See, e.g., State v. Watson*, 310 N.C. 384, 312 S.E. 2d 448 (1984); *State v. Dobbins*, 306 N.C. 342, 293 S.E. 2d 162 (1982).

Furthermore, we have held that when a defendant alleges prejudice at trial on the basis of pretrial publicity, he must show that he exhausted his peremptory challenges or that he had to accept jurors who were prejudiced by pretrial publicity. *State v. Watson*, 310 N.C. at 393, 312 S.E. 2d at 455. Here, defendant exercised only half of his available peremptory challenges.

Finally, the transcript of the jury selection process reveals that while numerous jurors had heard about the case through television or newspaper accounts of the killings, only one juror had tentatively formed an opinion about defendant's guilt. This juror was immediately excused by defense counsel with the consent of the prosecutor. Each juror selected to hear defendant's case stated unequivocally that he or she would determine defendant's guilt or innocence solely on the basis of evidence introduced at trial.

We hold that the motion for change of venue was properly denied.

[2] Defendant next contends the trial court erred by denying his motion for funds to hire a private investigator to assist in the preparation of his case. He bases his entitlement to such help upon G.S. 7A-450(b), which sets forth the responsibility of the State to provide an indigent defendant "with counsel and the other necessary expenses of representation," and G.S. 7A-454, which provides that the trial court may discretionarily "approve a fee for the service of an expert witness who testifies for an indigent person, . . . ."

It is well established that the issue of whether a private investigator should be appointed at State expense to assist an indigent defendant rests within the sound discretion of the trial judge. *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976). Experts for trial preparation should be provided only when there is a

reasonable likelihood that the expert will materially aid the defendant in the preparation or presentation of the defense or that without such help it is probable the defendant will not receive a fair trial. *State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981), *cert. denied*, 456 U.S. 932 (1982). We have held that the appointment of private investigators should be made "with caution and only upon a clear showing that specific evidence is reasonably available and necessary for a proper defense," since "[t]here is no criminal case in which defense counsel would not welcome an investigator to comb the countryside for favorable evidence." *State v. Tatum*, 291 N.C. at 82, 229 S.E. 2d at 568.

Applying these legal principles to the facts of this case, it is clear Judge Washington did not abuse his discretion by failing to appoint a private investigator for defendant.

A review of the transcript of the motion hearing reveals that defense counsel requested the appointment of a private investigator essentially because, as a sole practitioner, he did not have the time to interview and coordinate defendant's alibi witnesses. Counsel stated, however, that he had already talked to the witnesses. The gist of his argument was that a private investigator would be helpful as a witness coordinator and would be useful in determining which witnesses should be called to establish defendant's alibi defense.

Such an assertion by defense counsel does not rise to the level of showing a reasonable likelihood that the efforts of an investigator would discover additional evidence helpful to defendant. "[T]he State is not required by law to finance a fishing expedition for defendant in the vain hope that 'something' will turn up." *State v. Alford*, 298 N.C. 465, 469, 259 S.E. 2d 242, 245 (1979).

We find no abuse of discretion in the denial of defendant's motion for the appointment of a private investigator.

[3] These same considerations apply to defendant's contention of error in the trial court's denial of his motion for funds to hire a private psychiatrist.

By order of Judge David R. Tanis dated 19 April 1983, defendant was transferred to Central Prison in Raleigh in order that he might be observed by the medical staff of Dorothea Dix

Hospital to determine his capacity to proceed to trial. The psychiatrist's report, which was made available to defense counsel, indicated that defendant was capable of proceeding to trial and that he was legally sane. In the examining psychiatrist's opinion, defendant suffered from an anti-social personality disorder which was aggravated by drug and alcohol abuse.

On 2 August 1983, defendant moved that funds be made available to hire a private psychiatrist for a more thorough investigation of defendant's state of mind at the time he allegedly committed the crimes charged. Following a hearing, the trial court denied defendant's motion.

Under the circumstances here presented, we hold that the court's refusal to require the State to pay for an additional psychiatric evaluation was not error.

There was no serious contention that defendant lacked the capacity to stand trial or was insane at the time he allegedly committed the offenses. Defense counsel's admitted basis for attempting to secure an additional psychiatric evaluation at State expense was that he "was looking down the road to some extent . . . insofar as if the jury reaches the second issue in this matter and that's the thrust of my request in that regard."

Defendant clearly did not meet his burden of showing a reasonable likelihood that the expert would materially aid in the preparation of the case. The trial judge correctly denied defendant's motion for funds to pay for additional psychiatric testing and this assignment of error is therefore overruled.

[4] Defendant contends the trial court improperly excused six jurors for cause in violation of the principles established in *Witherspoon v. Illinois*, 391 U.S. 510, *reh'g denied*, 393 U.S. 898 (1968). *Witherspoon* permits the exclusion for cause of a juror if it is established that the juror "would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case. . . ." 391 U.S. at 522, n. 21 (emphasis in original). The North Carolina statute which sets forth the grounds for challenging a juror for cause, G.S. 15A-1212, adopts the *Witherspoon* test as the basis for excluding jurors who "[a]s a matter of conscience, regardless of the facts and circumstances," would be unable to return a verdict imposing the death penalty.

We conclude from our examination of the record that all jurors excluded for cause were properly excluded under the requirements of *Witherspoon* and G.S. 15A-1212(8). Each one of them emphatically stated that under no circumstances would he or she return a verdict of death. Their answers to the prosecutor's questions reveal an unwavering opposition to the death penalty and an unwillingness to set aside their beliefs to even *consider* death as a possible punishment.

Defendant next argues that the systematic exclusion of those jurors unalterably opposed to the death penalty prior to the guilt-innocence phase of the trial violated his right to due process and to trial by a jury drawn from a representative cross-section of the community. This argument has been consistently rejected by this Court. *See, e.g., State v. Bondurant,* 309 N.C. 674, 309 S.E. 2d 170 (1983); *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983). Since defendant advances no reason for us to abandon the reasoning of our prior decisions on this issue, these cases operate to preclude relief for defendant here.

[5] Defendant's third argument relating to the jury selection process is that the trial court impermissibly restricted the *voir dire* of prospective jurors by defense counsel. His specific contention is that the trial court erred by refusing to permit defense counsel to require prospective jurors to name the three persons, living or dead, that person most admired.

This contention is without merit. The regulation of the manner and extent of the inquiry on jury *voir dire* rests largely in the trial judge's discretion. *State v. Bracey,* 303 N.C. 112, 277 S.E. 2d 390 (1981). The question posed here by defense counsel could not reasonably be expected to result in an answer bearing upon the fitness of the juror to serve impartially. No abuse of the trial judge's discretion has been shown and this assignment of error is dismissed.

Defendant next contends that the trial court erred in failing to grant his motion to suppress. Defendant challenges the admission of his confession on two grounds: (1) the confession was obtained as a result of an illegal detention in violation of *Dunaway v. New York,* 442 U.S. 200 (1979); and (2) the confession was ob-

tained by threats and promises and was without a knowing and voluntary waiver of defendant's *Miranda* rights.

Upon defendant's renewal of his motion to suppress made during the course of the trial, the trial court conducted a voir dire hearing and made the following findings of fact and conclusion of law:

From the evidence offered, the Court finds that the defendant was, arrested on or about the ninth or tenth of February, nineteen hundred eighty-three, on a charge of armed robbery which had no connection with the charge — for which he is now being tried; that the officers had reason to believe that the defendant was a likely participant in the crime charged in this case. When asked about it, he denied any knowledge of the case.

About February 15th — strike that — about.

In February, 1983, after the defendant was arrested on the robbery charge and later on March twenty-third, 1983, Officer Lloyd had a conversation with Patricia Royal at which time she informed him that after the first of the year, the defendant was in her home and saw a television ad concerning a reward for those responsible — strike that — for information about those responsible for the murders now under investigation.

She informed Officer Lloyd that the defendant told her that if they only knew that he did it, that he would like to have another one like it; that based upon the information furnished by Patricia Royal, the officers had probable cause to interrogate the defendant.

On the morning of March twenty-third, 1983, at about nine-thirty-five AM, the defendant was advised of his *Miranda* rights and knowingly waived his right to counsel and to remain silent. When he was asked about this particular case, he said that he knew about a man named Johnny who had hit the Steak and Ale; that he was a big man, about six feet, six inches tall, weighing two hundred fifty pounds; that he drove a Datsun hatchback and had tatoos on his arm.

After further interrogation, he agreed to take a polygraph test before eleven o'clock that morning; that he took

the test at eleven and it was completed at twelve-thirty. Thereafter he was given lunch and returned to jail.

At four-thirty that afternoon, he was again interviewed and informed by Mr. Lynch, the polygraph operator, that he had failed to pass the polygraph test at which time he agreed to write out a statement which he did in his own handwriting. And based upon that, agreed to go to the Steak and Ale to show the officers how he entered the building. He informed them how to get there, which driveway to enter, showed where he had parked and the door he had entered.

When he returned, he was given his supper and was sitting alone when he saw Officer Branscome. That Officer Branscome told him he did not believe the statement that the defendant had theretofore written. The defendant thereupon agreed to make a further statement and agreed that Mr. Bullard could record the statement. At that time, which was early in the evening, the defendant made the statement which has been transcribed and offered into evidence by the State; that the statement was made about eight-twenty-seven PM on March twenty-third.

The Court finds further that Officer Lloyd — that Officer Lloyd told the defendant on March twenty-third he did not believe the defendant was telling the truth, but when asked if he was going to arrest the defendant's girlfriend named Cathy, Officer Lloyd informed the defendant that had he intended to arrest her, he would have done so in Albemarle when the defendant was apprehended with her on a robbery charge in that city. At the defendant's request, Officer Lloyd informed the defendant that he would be present at his court trial and at every court trial and that he has done so and testified.

Further, Officer Lloyd informed the defendant that if he gave a statement, that he would advise the District Attorney that he cooperated, but could not promise what would happen to him.

The Court further finds that the defendant has been arrested numerous times in the past; that he has heard the *Miranda* rights concerning numerous charges which have

heretofore been placed against him; that he was fully aware that he did not have to make a statement and that if he did make a statement, he could terminate that statement when he chose; that even though he informed the officers on the twenty-third that he was willing to answer part of their questions, he did not at any time request that they stop asking questions or that he—or suggest that he was unwilling to answer any particular question.

The evidence of the defendant concerning any other promise allegedly made to him are not accepted by the Court as true.

Upon the foregoing findings, the Court concludes that the defendant freely, voluntarily, without any coercion or promise made the statements—what are those exhibit numbers?

MR. FRASER: Three and five.

THE COURT: As shown on exhibits three and five.

The Court further finds and concludes that the exclusion of the evidence is not required by the Constitution of the United States or North Carolina; that the statements have not been obtained as a result of any substantial violation or any violation of the provisions of chapter 15A-974 of the General Statutes.

In making such determination, the Court finds that no particular interest of the defendant has been violated, there has been no deviation from lawful conduct on the part of the officers, and there has been no willful violation of any right of the defendant, and under all the circumstances, the court concludes that the evidence is competent and the motion to suppress is therefore denied.

The findings of fact by the trial court are binding upon this Court if supported by competent evidence in the record. *State v. Johnson*, 304 N.C. 680, 285 S.E. 2d 792 (1982). In this case, the court's findings are amply supported by the evidence presented on voir dire, and we are therefore bound by them. We are not, however, bound by the trial court's conclusions of law, and we may review them fully to ascertain whether they are supported by the findings of fact.

**[6]** Defendant first contends that his confession was obtained in violation of *Dunaway v. New York*, 442 U.S. 200, which held that an incriminating statement, made by a defendant who is seized without probable cause for his arrest, must be suppressed as "the fruit of the poisonous tree" unless some intervening event attenuates the effect of the unlawful seizure. *Id.*; *State v. Freeman*, 307 N.C. 357, 298 S.E. 2d 331 (1983). Defendant here argues that there was no probable cause to seize defendant, and also that there were no attenuating events occurring between defendant's unlawful arrest and his incriminating statement. We find that there was no unlawful arrest of defendant in this case and thus do not reach the issue of attenuating events. First, the defendant was already in custody and hence there was no seizure within the meaning of the fourth amendment. Second, the trial court specifically concluded, upon ample supporting evidence, that the officers had "probable cause to interrogate the defendant." Based upon our full review of the record and of the court's findings and conclusions, we are unable to find any error.

**[7]** Defendant also maintains that the court erred in concluding that his statement was made freely, voluntarily and after knowingly waiving his *Miranda* rights. Defendant argues that his statement was induced by promises and threats made by the officers to him. Again we disagree with defendant's contention. First, the trial court specifically found that Officer Lloyd only promised defendant to be present at defendant's trial and that defendant's cooperation would be communicated to the district attorney. The trial court explicitly rejected the "evidence of the defendant concerning any other promise allegedly made to him." There is ample evidence in the record to support the trial court's findings that the officers made no threats or promises which induced defendant to confess. The findings of fact in turn fully support the judge's conclusion that "the defendant freely, voluntarily, without any coercion or promise made the statements." We furthermore agree that, upon the evidence presented and the facts as found by the trial court, there was no *Miranda* violation in this case. The defendant's contentions regarding the admissibility of his confession are without merit.

**[8]** Defendant next assigns as error the failure of the trial court to exclude certain statements made by defendant on 24 March 1983. Defendant contends that, on 18 July 1983, he moved for

State v. Gardner

voluntary discovery pursuant to G.S. 15A-903(a), and that, on 25 July 1983, he requested production of all written and oral statements made by him which were in the possession of the prosecution. Both motions were granted. Nevertheless, defendant contends that the State failed to disclose statements made by him in which he described how the crime was committed, and that defendant was thereby prejudiced by the State's failure to comply. Defendant's brief on this point is far from clear, and while several different exceptions are noted, referring to several different statements by defendant, the brief details only the statements "allegedly made by defendant to [Detective Lloyd]" on 24 March 1983. The record discloses that defendant's original confession of having committed the killings occurred on 23 March 1983, at which time the statement was tape-recorded. On 24 March 1983, a transcription of the recording was read and signed by defendant. At trial, the prosecutor inquired of Detective Lloyd as to what occurred next:

Q. Did you have occasion to ask him any questions at that time or did he have an occasion to make a statement to you?

MR. FRASER: Objection, Your Honor.

THE COURT: Overruled.

MR. FRASER: May would he approach the bench?

THE COURT: Well, yeah, if you wish to.

(Conference at the bench.)

THE COURT: All right. Overruled. Go ahead.

Q. What, if anything, did he tell you at that time?

MR. FRASER: Objection.

THE COURT: Overruled.

A. We told him there were a couple of questions we would like to ask him to clarify the statement. He said okay, he would answer them.

He was asked again how he got into the Steak and Ale restaurant. He was then asked if he could describe the lady that came to the door. He stated she was about twenty-five

years old, attractive, brown hair, slender build, and she was wearing a white blouse.

He was asked what room he was in when he entered the building. He stated he knew it was not the dining room area for sure. He stated it might have been the kitchen area, but he could not be positive. He further stated it seemed like there were some boxes or something near the doorway when he entered.

MR. FRASER: Your Honor, object to that on the same grounds that I previously told the Court.

THE COURT: Overruled.

A. He stated that he could not draw a diagram of the interior because it was the first time he had been in the building. The writer then asked Gardner to describe the office. He advised he only remembered it as being sort of small. He stated he remembered the manager, the white male sitting at the desk doing paper work, and the desk was at the other end of the room.

Gardner described the white male as about the same age as the girl. He stated that he had short brown hair, no glasses, no beard, and wearing a light colored shirt.

Gardner was then asked if he remembered where he shot the two victims. He stated he shot the manager in the face and eye.

MR. FRASER: Your Honor, object and move to strike.

THE COURT: Overruled.

A. Gardner then added that he shot the girl in the back side of the neck. The writer then asked Gardner if he remembered what position the two victims were in when he left. Stated the manager was sort of slumped up on the wall, and the girl was lying on her side in the floor. Gardner gave no further information.

Q. Were warrants served on him subsequent to that time?

A. Yes, sir. We talked to District Attorney Tisdale and advised him of the above information and warrants were issued at that time.

Q. And he was returned to the county jail?

A. Yes, sir.

MR. TISDALE: You may examine.

We find no merit in defendant's argument. First, it is not at all evident from the record or from defendant's brief that there was indeed a violation of the discovery provisions. Second, assuming that the statement was not provided as required by G.S. 15A-903(a), it is simply inconceivable that it could have been sufficiently prejudicial as to warrant awarding defendant a new trial. The tape-recorded confession was played for the jury at trial and in it defendant recounted in great detail the events leading up to and surrounding the robbery and the murders. In our view, the statement made on 24 March 1982 was merely an elaboration and clarification, and defendant has not met his burden of demonstrating prejudice. Third, and again assuming there was a violation of discovery provisions, the sanctions, if any, which the trial judge may impose pursuant to G.S. 15A-910 are entirely discretionary and will not be reversed absent a showing of abuse. *State v. Alston*, 307 N.C. 321, 298 S.E. 2d 631 (1983). In this case, the trial court elected to impose no sanction, and defendant has failed to show any abuse of discretion. *Id.* This assignment is overruled.

[9] Defendant next argues that the trial court improperly expressed an opinion in its charge to the jury. In his instructions during the guilt-innocence phase of the trial, the trial judge, in an attempt to incorporate evidence of defendant's first written statement that "Johnny" was the perpetrator, charged as follows:

Now in that connection, members of the jury, the defendant contends that you should not believe either statement that's been offered in evidence as having been made by him, that is the alleged written statement or the taped statement. He contends you should not believe that either of those statements are true, but that if you do accept either of them, you should accept the first one and reject the last one because he contends that if he did anything, that the most you could find that he did was to drive someone else there to commit a robbery and wait in the car for him and drive him away, and in case you should accept that theory, though he contends that you should acquit him. But if you should accept that, then the

question arises as to whether the defendant is guilty of murder in the first degree by reason of aiding and abetting some other person in committing the alleged murders.

The court went on to instruct on the theory of aiding and abetting. We have reviewed the charge carefully and thoroughly, including the challenged portion quoted above. We are of the opinion that Judge Fountain's charge was supported by the evidence and was accurate and fair in every respect. This assignment is overruled.

[10]  Defendant contends that the trial court erred in denying his motion to suppress the identification of him by the witness Linda Cain. Defendant argues that the identification by the eyewitness was inherently unreliable, that the pretrial photographic line-up was impermissibly suggestive, and that the witness's identification at trial was a result of the improper photographic line-up and therefore also inadmissible. We disagree.

> The test under the due process clause as to pretrial identification procedures is whether the totality of the circumstances reveals pretrial procedures so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice.

*State v. Henderson*, 285 N.C. 1, 9, 203 S.E. 2d 10, 16 (1974), *death penalty vacated*, 428 U.S. 902 (1976).

Upon defendant's objection at trial, the trial court conducted a voir dire hearing to determine the admissibility of the identification testimony. After hearing the evidence, he made the following findings of fact:

> THE COURT: All right. Let the record show, please, that upon the defendant's objection, testimony relating to a photographic line-up, the defendant conducted—the Court conducted a voir dire examination in the absence of the jury —excuse me, did you want to offer any evidence on this question, Mr. Fraser?

> MR. FRASER: No, Your Honor.

> THE COURT: From the evidence offered—strike that— from the uncontradicted evidence offered, the Court finds

that the witness had, prior to August—prior to March 24th, 1983, been shown approximately one hundred photographs to see if she could identify the person seen by her on the early morning hours of December twenty-third, 1982. She did not select any such person whose photographs was shown her.

On December 24th in the afternoon, Officer Bullard showed the witness six color photographs, each bearing a picture of a white male apparently of the approximate—approximately of the same age, each wearing a beard, each showing a full face. The officer made no suggestion to the witness as to whether the photograph of a suspect or that of the defendant or any other particular person was among the six photographs shown her; that upon examining the photographs, she discarded three; of the remaining three, she discarded one; of the remaining two, she discarded one and selected the photograph of the defendant as being a photograph of the person she had seen in the parking lot of Steak and Ale Restaurant on the—in the early morning of December twenty-third, 1982.

\*　\*　\*　\*

Let me add this: That no impermissible suggestion was made by anyone to the witness as to which photographs if any she should select.

Defendant made no objections to any of the foregoing findings. Each of the findings is amply supported by the evidence and the findings in turn support the trial court's conclusion that the pretrial procedures were not impermissibly suggestive. *See State v. Chatman*, 308 N.C. 169, 301 S.E. 2d 71 (1983). Furthermore, the judge specifically concluded that the witness's in-court identification was "based upon her observation at the time and independent of any photographs that were shown her on March 24th." *See id.* This assignment of error is overruled.

Defendant argues next that the trial court committed error in denying his motion to dismiss the charge of first-degree murder and his motions to set aside the verdict and for a new trial. Defendant points to no evidence or lack of evidence in this record to support his contention. We do not deem it necessary to review here the facts of this case. Suffice it to say that, applying the familiar test of the sufficiency of the evidence, and taking the

evidence in the light most favorable to the State, as we must, we find that there is substantial evidence of each essential element of the offense charged and of the defendant's being the perpetrator of the crime. See *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982). We, therefore, hold that the trial court properly denied defendant's motions in this case.

[11]  By his next assignment, defendant contends that the trial court erred in allowing the prosecutor to cross-examine him concerning his alleged participation in an unrelated murder. Defendant here took the stand to testify in his own behalf, and, in so doing, he became, as any other witness, subject to cross-examination and to impeachment, including inquiry into previous convictions or specific instances of misconduct. *State v. Clark*, 300 N.C. 116, 265 S.E. 2d 204 (1980); *State v. Herbin*, 298 N.C. 441, 259 S.E. 2d 263 (1979). During cross-examination of defendant in this case, the district attorney questioned him concerning his involvement in various robberies. Defendant admitted participating in robberies with Ronald Bruscia, Jeff Royal, Randy Taylor, and Richard Small. The following exchange then took place:

Q. I'll ask you if you did not go to Rowan County on the 17th day of December and did kill and murder one Mr. Shaver in his home.

MR. FRASER: Objection.

THE COURT: Overruled.

Exception No. 65

A. No, Sir, I didn't.

Q. But you were involved in that, is that correct?

A. No, Sir.

Q. You were not present?

A. No, Sir.

The question to which defendant objected was entirely proper as an inquiry into a specific instance of misconduct, *State v. Clark*, 300 N.C. 116, 265 S.E. 2d 204, and there is no evidence or even suggestion of lack of good faith on the part of the prosecutor. *See State v. Ruof*, 296 N.C. 623, 252 S.E. 2d 720 (1979).

The further questioning amounted to "sifting" the witness, the limited practice of which has been approved by this Court. See *State v. Lampkins*, 283 N.C. 520, 196 S.E. 2d 697 (1973). This assignment is without merit.

[12] Defendant next alleges error in the prosecutor's closing argument during the guilt phase of the trial. Defendant made no objection to the portions he now challenges; even so, he contends the remarks were so prejudicial and improper as to require the trial court to act on its own motion. As we said in *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979),

> the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*Id.* at 369, 259 S.E. 2d at 761. We have reviewed the prosecutor's argument in this case, including the portions now challenged by defendant, and we find nothing so grossly improper as to require corrective action by the trial judge *ex mero motu*.

[13] By his next assignment, defendant argues that evidence that he was seen possessing a sawed-off shotgun in January and February of 1983 was irrelevant and therefore inadmissible. This contention is wholly without merit. The killings which form the core of this case occurred in late December 1982. Evidence that defendant possessed shortly thereafter a weapon similar to that used in the murder is relevant evidence. We therefore overrule this assignment of error.

Defendant next contends that the trial court erred in sustaining the State's objection to the following question asked during cross-examination of Detective Bullard by defense counsel:

> Q. And all the investigation—in all the investigation that was done, there was no scientific evidence whatsoever recovered that incriminated John Gardner, was it?

> MR. TISDALE: Objection, Your Honor.

> THE COURT: Sustained.

Bearing in mind the familiar rule that a general objection, which is sustained, is sufficient "if there is any purpose for which

the evidence would be inadmissible," 1 Brandis on North Carolina Evidence § 27 (1982), we hold that, even assuming error in the judge's ruling, defendant has not demonstrated that such error was prejudicial. This assignment is overruled.

[14]  Defendant next argues error in the submission of the aggravating factor that the murder was committed for pecuniary gain. Defendant, relying upon the 1983 legislative amendment to the Fair Sentencing Act's pecuniary gain provision, G.S. 15A-1340.4(a)(1)c, submits that the "pecuniary gain" aggravating factor found in the death penalty statutes, G.S. 15A-2000(e)(6), should be redefined to mean that the "defendant was hired or paid to commit the offense." G.S. 15A-1340.4(a)(1)c, as amended in Ch. 70, 1983 Sess. Laws. We disagree.

In *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981), we interpreted G.S. 15A-2000(e)(6) to permit submission of the pecuniary gain factor when the killing was for the purpose of getting money or something of value. On the other hand, in construing G.S. 15A-1340.4(a)(1)c, we held that the Legislature intended "pecuniary gain" there only to mean the defendant was "hired or paid to commit the offense." In so holding we relied specifically upon the legislative act passed in the 1983 Session Laws entitled "An Act to Clarify the Aggravating Factor Regarding Pecuniary Gain." The Act only applied to the Fair Sentencing Act; no such clarification or explanation was made regarding G.S. 15A-2000(e) (6). We therefore perceive no reason to depart from our ruling in *Oliver. State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983). The aggravating factor that the murder was committed for pecuniary gain was properly submitted to the jury.

[15]  Defendant's next assignment is the trial court's failure to give a peremptory instruction that his age must be considered as a mitigating circumstance. There is no merit to this contention. Defendant was 24 years old at the time of the commission of these crimes. The trial judge submitted to the jury the age of defendant as a possible mitigating circumstance for their consideration. The jury failed to find defendant's age as a mitigating factor. As we stated in *State v. Oliver (II)*, 309 N.C. 326, 307 S.E. 2d 304 (1983),

Any hard and fast rule as to age would tend to defeat the ends of justice, so the term youth must be considered as relative and this factor weighed in the light of varying conditions and circumstances. It is well known that two young persons

may vary greatly in mental and physical development, experience and criminal tendencies [citation omitted]. One of these factors may have greater significance than others in some cases, depending on the circumstances.

*Id.* at 372, 307 S.E. 2d at 333 (quoting *Giles v. State*, 261 Ark. 413, 421, 549 S.W. 2d 479, 483 (1977) ). The trial court committed no error in failing to peremptorily instruct the jury as to this mitigating factor.

With the exception of his proportionality argument, all of the defendant's remaining assignments have heretofore been addressed and decided by the Court adversely to defendant. He has failed to persuade this Court that any of those prior rulings are in error and thus we are not inclined to disturb them.

[16]   As we are required to do in every death case, we turn now to defendant's proportionality argument. Pursuant to G.S. 15A-2000(d)(2), we must review the record in this case and determine

(1) whether the record supports the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

*State v. Bondurant*, 309 N.C. 674, 692, 309 S.E. 2d 170, 181 (1983). We have reviewed carefully the record and find that the evidence fully supports the two aggravating circumstances found by the jury. Furthermore, we are unable to conclude that the jury imposed the death penalty "under the influence of passion, prejudice, or any other arbitrary factor." *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983).

Finally, in comparing this case to similar cases in which the death penalty was imposed, we cannot say that the sentence of death in this case is disproportionate or excessive, considering both the crime and the defendant. The killings in this case were part of a violent course of conduct, and were coldblooded, calculated, and senseless. *See State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984); *State v. Craig & Anthony*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 104 S.Ct. 263 (1983); *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, 103 S.Ct. 474 (1982). We,

therefore, decline to set aside the death penalty imposed. In all phases of the trial below, we find

No error.